1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF HAWAII

3                    ---:---

4   DE-OCCUPY HONOLULU; CATHERINE ) Civil No.
    RUSSELL; CHRISTOPHER SMITH;   ) CV12-00668 JMS-KSC
5   ANDREW SMITH; MADORI          )
    RUMPUNGWORN; DOMINIC JAMES;   )
6   and JOHN DOES 1-50,           )
                                  )
7              Plaintiffs,        )
                                  )
8        vs.                      )
                                  )
9   CITY AND COUNTY OF HONOLULU;  )
    WESTLEY CHUN, in his personal )
10  and official capacity; TRISH  )
    MORIKAWA, in her personal and )
11  official capacity; LARRY      )
    SANTOS, in his personal and   )
12  official capacity; KEN        )
    SHIMIZU, in his personal and  )
13  official capacity; and John   )
    Does 1-50,                    )
14                                )
               Defendants.        )
15  _____ )

16

17            DEPOSITION OF WESTLEY CHUN

18  Taken on behalf of Plaintiffs at the Department of

19  the Corporation Counsel, 530 South King Street,

20  Room 110, Honolulu, Hawaii, commencing at 1:10

21  p.m. on January 6, 2014, pursuant to Notice.

22

23

24  Before:   WILLIAM T. BARTON, RPR, CSR NO. 391

25

      CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

2

```
 1   APPEARANCES:

 2        For Plaintiffs
               RICHARD L. HOLCOMB, ESQ.
 3             BRIAN J. BRAZIER, ESQ.
               1136 Union Mall, Suite 808
 4             Honolulu, Hawaii 96813
               (808) 545-4040
 5             rholcomblaw@gmail.com
               brianbrazier@gmail.com
 6
          For Defendants City and County of
 7        Honolulu, Westley Chun, Trish Morikawa,
          and Kenneth Shimizu
 8             ERNEST H. NOMURA, ESQ.
               Department of the Corporation Counsel
 9             530 South King Street, Room 110
               Honolulu, Hawaii 96813
10             (808) 768-5120
               enomura@honolulu.gov
11
          Also present
12             Jennifer Waihee-Polk

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                           I N D E X

2   EXAMINATION                              Page
    By Mr. Holcomb                           4
3
    WESTLEY CHUN
4   Deposition Exhibits                      Marked
    1      CD with videos                    4
5
    2-12  Production documents               4
6
    3      Declaration                       79
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          (Whereupon, production documents were

2    marked as Exhibits 1 through 12 for

3    Identification.)

4                    WESTLEY CHUN,

5    Called as a witness by Plaintiffs, having been

6    first duly sworn, was examined and testified as

7    follows:

8                    EXAMINATION

9    BY MR. HOLCOMB:

10       Q.    Will you state your name please, sir.

11       A.    Westley Chun.   W-E-S-T-L-E-Y, C-H-U-N.

12       Q.    Have you ever had your deposition taken

13   before, Mr. Chun?

14       A.    No.

15       Q.    Are there any medications -- are you on

16   under the influence of any medications, drugs or

17   alcohol or anything else that would prevent you

18   from telling the truth today?

19       A.    No.

20       Q.    Are there any other factors that you can

21   think of that would prevent you from telling the

22   truth today?

23       A.    No.

24       Q.    You realize you're under oath, right?

25       A.    Yes.

5

1      Q.   And you're under the penalty of perjury.

2

3           If you did lie, you could be subject to

4    perjury charges, correct?

5           MR. NOMURA:  Well, to the extent that a

6    court finds.

7    BY MR. HOLCOMB:

8      Q.   To the extent that the court finds.

9    It's just as if you were testifying in court.

10          Do you understand that?

11     A.   Yes.

12     Q.   You must answer verbally.  Head nodding

13   doesn't suffice.  We have a court reporter that

14   has to transcribe everything.  Please say yes or

15   no or answer the question that I ask you.

16          Do you understand that?

17     A.   Yes.

18     Q.   If you don't understand, and you agree

19   to tell me, I don't understand the question, and

20   I'll try to rephrase for you, okay?

21     A.   Yes.

22     Q.   You have been overseas for some time.

23          Is that true?

24     A.   Yes.

25     Q.   When did you go overseas?

6

1       A.    Starting in February of this -- of last

2  year.

3       Q.    When did you come back?

4       A.    On this trip, December 23rd.

5       Q.    So you were gone from February 2013

6  until December 23, 2013?

7       A.    Off and on.

8       Q.    So you have been back to Honolulu?

9       A.    Yes.

10      Q.    How many times?

11      A.    As best as I can recall, I believe this

12  is my fourth time.

13      Q.    How long do you usually stay when you

14  come back?

15      A.    Two weeks.

16      Q.    When is the last time before December

17  23rd that you came back?

18      A.    As best as I can recall, October.

19      Q.    Okay.  Now, how does it work?  I'm sure

20  that you have family and friends and your lawyer

21  that you want to communicate with.

22            How do you communicate with people

23  while you're overseas, people in Hawaii?

24            MR. NOMURA:  Vague and ambiguous.

25  BY MR. HOLCOMB:

7

1      Q.   Do you have access to email while you're

2  overseas?

3      A.   Yes.

4      Q.   Do you have access to telephone while

5  you're overseas?

6      A.   Limited.

7      Q.   Have your friends and family contacted

8  you while you were overseas, either by email or

9  telephone?

10     A.   Yes.

11     Q.   Your lawyer has contacted you while you

12  were overseas?

13     A.   Yes.

14     Q.   When were you first approached to assist

15  your lawyer in answering our discovery requests?

16     A.   I don't recall.

17     Q.   Were you approached to assist?

18          MR. NOMURA:  Objection to the extent

19  that it calls for an invasion of the

20  attorney/client privilege.  I'm going to instruct

21  him not to answer.  Suffice it to say that Mr.

22  Chun has been working with the City's Corporation

23  counsel's office in terms of preparing responses

24  to discovery requests.  And that will be

25  forthcoming.

8

1          MR. HOLCOMB:  All right.  Ernest, I

2  understand your objection.  I don't want to ask

3  you -- I should prefaced my question.  I don't

4  want to ask you the substance of any

5  communications you've had with Ernest or any other

6  attorney that's representing you in this matter,

7  either what you said to them or what they said to

8  you.

9  BY MR. HOLCOMB:

10      Q.   I'm just wondering, when did you begin

11  trying to answer these written discovery requests?

12      A.   As I said earlier, I don't recall.

13      Q.   Has it been since you returned from

14  overseas?

15          MR. NOMURA:  In December?

16  BY MR. HOLCOMB:

17      Q.   Has it been after you returned on

18  December 23rd?

19      A.   Rephrase the question again.

20      Q.   Okay.  You returned from overseas

21  December 23rd, correct?

22      A.   Yes.

23      Q.   Was it after that time that you began

24  assisting in answering the discovery requests?

25          MR. NOMURA:  Again, to the extent that

9

1  any response Mr. Chun my indicate an invasion of

2  attorney/client privilege, I'm going to instruct

3  him not to answer.  Like I said before, Mr. Chun

4  has been working with the Department of

5  Corporation counsel's office with respect to the

6  responses to plaintiff's discovery requests.

7          Mr. Chun has already testified that

8  he's returned from overseas as of December 23rd

9  and that since that time, he has been with his

10  family, et cetera, and to the extent that any

11  response as to him communicating with me or anyone

12  else at the Department of Corporation counsel with

13  respect to the discovery requests, I'm going to

14  instruct him not to answer.

15          Now, if you can explain to me, Richard,

16  why this inquiry is being sought, then fine, I'll

17  be happy to explain it.  But I don't know if it's

18  appropriate to ask Mr. Chun the discussions of

19  what he's been asked to do to assist the City in

20  its defense, specifically as to the request for

21  discovery propounded on the City.

22          MR. HOLCOMB:  I agree with that

23  statement, Ernest.  My question was:  When did he

24  begin assisting answering his discovery request?

25          MR. NOMURA:  I think he testified that

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

10

1   he does not recall.

2           MR. HOLCOMB:  My follow-up question

3   was:  Was it after December 23rd or before

4   December 23rd?  That's all I'm interested in

5   knowing about.

6           MR. NOMURA:  The problem that I have --

7   and I'm not trying to put word in Mr. Chun's

8   mouth, but if he doesn't recall when he started to

9   assist the City, it makes it difficult for me to

10  fathom that he will be able to testify one way or

11  the other if it were before or after December

12  23rd.

13          MR. HOLCOMB:  So is his answer to that

14  question then that he does not know?

15          MR. NOMURA:  He already testified that

16  he does not recall.

17  BY MR. HOLCOMB:

18      Q.   We'll move on.  I want to ask you about

19  your background, Mr. Chun.

20           Do you understand?

21      A.   Yes.

22      Q.   You're an engineer by trade?

23      A.   By profession, yes.

24      Q.   And you have obviously underwent quite

25  an education to become an engineer, true?

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

11

1      A.   True.

2      Q.   You have a PhD?

3      A.   Yes.

4      Q.   Tell me about your academic history.

5           Where did you go to college and what

6   did you do for grad school, et cetera?

7      A.   I received my Bachelors of Science

8   degree in Civil Engineering from the University of

9   Hawaii at Manoa.  I then received my Masters of

10  Science degree in Civil Engineering from the

11  University of California at Davis.

12          I took a break in school, got licensed,

13  and then went back to school to get my PhD in

14  Civil Engineering from the University of

15  California at Davis.

16     Q.   When did you go to undergrad?

17     A.   Between 1974 and 1978.

18     Q.   When did you get your -- when did you go

19  to the school to get your Masters?

20     A.   Right after graduating with my Bachelors

21  of Science.

22     Q.   So that would be 1978, you started?

23     A.   Actually, '79.

24     Q.   '79, you started the Masters program?

25     A.   Correct.

1      Q.   When did you graduate from that?

2      A.   1980.

3      Q.   Then when did you go back and get your

4  PhD?

5      A.   1984.

6      Q.   Now, I want to ask you also a little bit

7  about your work history.  Tell us since 1984 where

8  you've worked and what's your job titles and

9  duties were at those places.

10     A.   1984, I returned, as I mentioned

11  earlier, to the PhD program at the University of

12  California at Davis.  While there, I was a

13  teaching assistant, a research assistant, and also

14  taught classes as an associate in.  After

15  graduating, I then worked in the private sector as

16  an engineer until my stint with the Army Corps of

17  Engineers.  I had a special assignment with them

18  for 13 months before I took the appointed position

19  with the City.

20     Q.   Tell us more history about your private

21  sector.

22          When did you begin working in the

23  private sector?  What jobs did you have and what

24  duties did you have at those jobs?

25          MR. NOMURA:  Objection.  Compound.

13

1    Vague and ambiguous.

2    BY MR. HOLCOMB:

3        Q.   We can do it one by one.

4             When did you first start working in the

5    private sector after gaining your PhD from the

6    University of California Davis?

7        A.   Could you repeat that.

8        Q.   When did you first begin working in the

9    private sector following your graduation from the

10   PhD program at Davis?

11       A.   1988.

12       Q.   Where did you work?

13       A.   At CH2M Hill, in their San Francisco

14   office.

15       Q.   How long did you work there?

16       A.   About three years.

17       Q.   What was your title or position?

18       A.   I do not recall.

19       Q.   What were your duties?

20       A.   I served as a project engineer and

21   project manager on various projects.

22       Q.   When you say project engineer and

23   project manager, tell us what you do.  We're

24   lawyers; we don't really know.

25       A.   Planned and designed water and

14

1  wastewater systems.

2       Q.   For various municipalities?

3       A.   In the Bay area.

4       Q.   In the Bay area.

5            So you worked there from 1988 until

6  1991?

7       A.   Yes.

8       Q.   What did you do in 1991?  Why did you

9  quit?

10      A.   I returned home to Hawaii.

11      Q.   What did you do?  What kind of job did

12 you have then?

13      A.   Worked with Brown and Caldwell.

14      Q.   How long did you work there?

15      A.   About three years as well.

16      Q.   What was your position or title there?

17      A.   I don't recall.

18      Q.   What were your job duties?

19      A.   Similar to my duties at CH2M Hill.

20 Project engineer, project manager.  And I was

21 their Honolulu office manager.

22      Q.   Did you plan and design water and

23 wastewater systems there as well?

24      A.   Yes.  As well as a landfill closure.

25      Q.   Other than the water and wastewater and

15

1  landfill closure, were there any other types of

2  projects you were responsible for?

3      A.   I don't recall.

4      Q.   You said you were their office manager.

5

6           What does that mean?

7      A.   I was essentially their company

8  representative on island, serving as the primary

9  point of contact for the company.

10     Q.   So if I needed a service that your

11 engineering company was capable of doing, I would

12 contact you?

13     A.   In general, yes.

14     Q.   Did you have any administrative duties

15 that went along with that?

16     A.   Typically when you manage projects, you

17 have to handle the financials, the staffing, the

18 client relations.

19     Q.   So were you -- did you supervise

20 employees under you when doing your duties

21 managing these projects?

22     A.   Which projects are you referring to?

23     Q.   The ones at Brown and Caldwell.

24     A.   A few people, yes.

25     Q.   How many?

16

1      A.   There was one other person in our

2   office.  And depending on the project, there could

3   be five, there could be ten, there could be many

4   more.

5      Q.   Now, the one other person in your

6   office, they were a permanent employee, correct?

7      A.   Yes.

8      Q.   Another engineer?

9      A.   Yes.

10     Q.   Depending on the project, I assume that

11  there would be a lot of labor and probably some

12  people with special skills that you would need to

13  hire in order to complete that project or contract

14  with to complete that project, true?

15     A.   Yes.

16     Q.   And you were in charge of what those

17  people did as well, correct?

18     A.   If we contracted them directly, yes.

19     Q.   Now, were you often on job sites during

20  this time?

21     A.   Sometimes.

22     Q.   And describe your role of what duties

23  you would perform on the actual job sites.

24     A.   Generally, to do a site assessment.

25     Q.   What is a site assessment?

17

1    A.    To better understand the scope of the

2    work.

3        Q.    What did you do to better understand the

4    scope of the work?

5        A.    Reviewed physical facilities and

6    interview individuals.

7        Q.    And so you said you worked there from

8    1991 for three years.  That puts us at 1994.

9              Is that true?

10   A.    Yes.

11       Q.    Did you quit Brown and Caldwell in 1994?

12

13   A.    Yes.

14       Q.    Why?

15       A.    CH told me they will offer me a position

16   back, but in their Honolulu office.

17       Q.    So you went back with the company that

18   you had worked for from 1988 to 1991?

19   A.    Yes.

20       Q.    Just this time in Honolulu?

21   A.    Yes.

22       Q.    How long did you stay at CH2M Hill in

23   Honolulu?

24   A.    I worked at CH2M Hill in Honolulu until

25   about 1997.

18

1     Q.   So another three years or so?

2     A.   Yes.

3     Q.   Were your duties essentially the same as

4   they were in San Francisco?

5     A.   They were more expanded.

6     Q.   In what ways?

7     A.   There was more staff that I was involved

8   with, and I was managing larger projects with more

9   people.

10     Q.   What types of projects were you

11   managing?

12     A.   One project I can think of offhand was

13   an infiltration info study for the City and County

14   of Honolulu.

15     Q.   What does that mean exactly?

16     A.   It was -- that particular project was

17   developing a flow routing model to route sewer

18   flows through the sewer system and developing a

19   program so that people could use a program to see

20   whether the sewer had enough capacity before the

21   City issued a connection permit.

22     Q.   And you just did a study to evaluate

23   that, correct?

24     A.   No.  We actually worked on developing

25   computer programs.

19

1    Q.    So not only did you study it, you helped

2 develop a resolution for some issues that you may

3 have found.

4         Is that fair?

5    A.    It was more developing than studying.

6    Q.    So let me understand how this works.  So

7 the City contacts your engineer firm and says, We

8 need to develop more sewage capacity for this area

9 of the island?  Is that kind of how it works?

10   A.    No.

11   Q.    Tell me how you get involved in a

12 project like that then.

13   A.    The City would put out an announcement

14 once a year.  And if there was any new projects

15 that cropped up in between when they would put in

16 their next announcement the following year, they

17 would advertise for a project.  Any interested

18 consultant or contractor would then express an

19 interest.

20   Q.    So you would bid on the job?

21   A.    We wouldn't bid.  We would propose on a

22 project.

23   Q.    What would you propose?

24   A.    Generally a project approach.

25   Q.    Would you propose how much it would

20

1   cost?

2       A.   If I recall, under state procurement

3   law, nonbid contracts, it's by qualification-based

4   selection.

5       Q.   Would you propose how much it would

6   cost?

7       A.   Are you asking for that particular

8   project or in general?

9       Q.   In that particular project.

10      A.   We did not.

11      Q.   What about in general?

12      A.   Qualification-based selection, you just

13  propose based on your qualifications.

14      Q.   Did you propose how much it might cost

15  or give them a ceiling as to how much it would

16  cost?

17      A.   Not at the time that we were proposing.

18      Q.   But then I assume there's more than just

19  proposing and saying, The City then accepts, yes,

20  we're going to use your firm, correct?

21      A.   Excuse me.  Could you repeat that.

22      Q.   Well, there's more steps involved than

23  you just setting a proposal before the City

24  actually contracts with a firm to do the work; is

25  that fair?

1      A.    It would depend.   Sometimes they will

2  select just based straight on the proposal.

3  Sometimes you would to go through an additional

4  step of actually interviewing for the project.

5      Q.    Now, in Honolulu, were you the top

6  person at that office, you were the supervisor of

7  the Honolulu office?

8      A.    No.

9      Q.    Okay.   How many people were working

10  there above you?

11      A.    One.

12      Q.    And did he handle -- did he or she

13  handle the proposals?

14      A.    No.

15      Q.    Now, once you contracted to do the work,

16  then what was your role?

17      A.    As a project manager.

18      Q.    So then your role would be essentially

19  the same as San Francisco, once you procured the

20  contract, correct?

21      A.    We would have to make sure that we

22  submitted the project on time and within the

23  scope, and also meet the financial goals of the

24  project.

25      Q.    But you planned and designed water and

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

22

1  wastewater systems?

2       A.   Could you repeat that, please.

3       Q.   I said, but you essentially planned and

4  designed water and wastewater systems?

5       A.   What time period are you referring to?

6       Q.   Well, right now, I'm referring to this

7  specific project that we're talking about with the

8  City while you worked at CH2M Hill infiltration

9  inflow project that we were discussing.

10      A.   Again, that project was primarily

11 developing computer applications that the City

12 could use.

13      Q.   Okay.  So you didn't actually, I guess I

14 don't know what they call it in the trade, but you

15 didn't actually go on site, break ground and lay

16 pipes and design all the piping systems and all

17 that, did you?

18      A.   I did not as part of that project.

19      Q.   What other projects do you recall

20 working on there?

21      A.   The Laie water reclamation facility.

22      Q.   And there you designed that facility and

23 assisted in having it built.

24           Is that fair?

25      A.   Yes.

23

1      Q.   And your role in that project was

2   essentially the same as the other one?

3      A.   No.

4      Q.   What was your role in that project?

5      A.   Local coordinator.

6      Q.   So what does that mean?

7      A.   Our project manager was in our Portland,

8   Oregon office, working with our design center in

9   Corvallis, Oregon.  Any input or work that they

10   needed done locally, I would help coordinate that

11   work.

12      Q.   When you say coordinate that work, what

13   does that mean exactly?

14      A.   Seek out the resources we would need,

15   facilitate with the contracting, and holding them

16   to a schedule.

17      Q.   Did you pretty much supervise the work

18   on the ground at that point or out on the job site

19   at that point?

20      A.   It was primarily done in the office.

21      Q.   Now, are there any other projects that

22   you remember working on at CH2M Hill Honolulu?

23      A.   There were other ones but they were

24   smaller.  Those were probably the two largest

25   projects.

24

1      Q.   Let me ask you this:  Did you at any

2   time work on anything that involved going out and

3   enforcing ordinances?

4      A.   Well, typically with water and

5   wastewater projects, you have to meet discharge

6   requirements or health and safety requirements.

7      Q.   Okay.

8      A.   As an example, many of the projects I

9   worked on in the Bay area were under court order

10  or consent decree.  The two projects that I

11  identified working at CH2M Hill, the two computer

12  applications that were developed was done under a

13  consent decree.   The Laie project was done under

14  a consent order.

15     Q.   But my question, I guess, has to do with

16  you as an engineer ensured compliance with

17  whatever the consent order or consent decree had

18  ordered, correct?

19     A.   Could you repeat the question.

20     Q.   Your job as the engineer in these two

21  projects, there was a consent order and a consent

22  decree that laid out certain specifications that

23  had to be met, correct?

24     A.   Yes.

25     Q.   You as the engineer were responsible to

25

1 make sure that those specifications were met?

2　　A.　As best as we could.

3　　Q.　But you didn't go out and cite

4 facilities or seize property or anything that

5 would be more geared towards enforcing any

6 noncompliance with those orders or decrees, did

7 you?

8　　A.　Could you repeat the question.

9　　Q.　All right.  You didn't do anything like

10 issue citations or seize property in order to

11 remedy or punish noncompliance with those

12 specifications?

13　　A.　That's correct.

14　　Q.　Now, that takes us through 1997.

15　　　What did you do after 1997?

16　　A.　With CH2M Hill, I worked in Alaska.

17　　Q.　What did you do in Alaska?

18　　A.　The largest U.S. Coast Guard station is

19 in Kodiak.  So I studied their wastewater system

20 from treatment plant -- I mean from collection

21 system, treatment plant, to outfall.

22　　Q.　When you say "studied it," what does

23 that mean?

24　　A.　We actually did some physical

25 inspections, testing of their systems and then

26

1  coming up with recommendations for improvement.

2       Q.   Did you implement any of those

3  recommendations?

4       A.   I'm not sure.

5       Q.   Your role in that particular job was

6  just to do the study, correct?

7       A.   Project manager of the study.

8       Q.   So you were responsible to make sure the

9  study was done properly?

10      A.   Yes.

11      Q.   And then you don't know what happened

12  once you made your recommendations, based on the

13  study?

14      A.   That's correct.

15      Q.   How long did that study take, sir?

16      A.   About nine months.

17      Q.   What did you do after that nine-month

18  period?

19      A.   Then with CH2M Hill, I worked in their

20  Kuala Lumpur office.

21      Q.   How long did you work there?

22      A.   Almost two years.

23      Q.   What were your job duties there?

24      A.   I was their water business manager for

25  the country of Malaysia.

27

1      Q.    So essentially, you assisted the country

2    of Malaysia in their water system and wastewater

3    system, correct?

4      A.    In this particular case, it was more

5    their wastewater system.

6      Q.    And tell us, I guess, more specifically

7    what you did in assisting them with their

8    wastewater system.

9      A.    Provided -- we provided engineering

10   support on about three of their large wastewater

11   treatment plants that were being design built.

12     Q.    Now, were you responsible for the actual

13   building of that, or were you more in a consulting

14   capacity?

15     A.    As I said earlier, engineering support,

16   consulting capacity.

17     Q.    Were you supervising anyone at that

18   particular -- in that particular appointment to

19   Malaysia?

20     A.    Yes.

21     Q.    How many people?

22     A.    There was about five in the office.

23     Q.    Were they all engineers?

24     A.    Two of them were.

25     Q.    What were the other three?

28

1      A.    Office support.

2      Q.    Now, that takes us up to about the year

3  2000.

4            Is my math correct on that?

5      A.    1999.

6      Q.    Still 1999, okay.

7            What did you do in 1999?

8      A.    We turned back to Honolulu and then

9  changed jobs.

10      Q.    Why did you change jobs?

11      A.    My wife gave birth to triplets.  I could

12  no longer travel, and my current employer wasn't

13  able to accommodate me at home at that time.

14      Q.    So where did you work then?

15      A.    Engineering Solutions.

16      Q.    You started there in 1999, sir?

17      A.    Yes.

18      Q.    What was your job title or position

19  there?

20      A.    I was one of three principals.

21            (Whereupon, a telephone sounded.)

22            MR. NOMURA:  Can we take a break?

23            MR. HOLCOMB:  Sure.  Can we go off the

24  record?

25            (Discussion off the record.)


CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

29

```
 1              (Whereupon, a recess was taken.)

 2   BY MR. HOLCOMB:

 3       Q.   Mr. Chun, when you said you were one of

 4   three principal, s tell us what that means

 5   exactly.

 6       A.   Any one of us would go out and pursue

 7   work, complete the work, sign contracts;

 8   essentially responsible for the day-to-day running

 9   of the office and company.

10       Q.   Did you -- do you mean that you had

11   partial ownership of the company?

12       A.   To a certain extent, yes.

13       Q.   And you and your -- the other two

14   principals would go out and find your own jobs?

15       A.   We would work collaboratively with each

16   other.

17       Q.   All right.  But you would divvy up

18   responsibility between what jobs you had in the

19   office?

20       A.   Yes.

21       Q.   Now, tell me what kind of jobs you

22   worked on there at Engineering Solutions.

23       A.   Probably the most work that I did while

24   I was there was converting cesspools to proper

25   wastewater systems throughout the state.
```

30

1     Q.    Was the State of Hawaii your primary

2  customer?

3     A.    Yes.

4     Q.    And did you supervise people in

5  converting these cesspools?

6     A.    Yes.

7     Q.    How many people?

8     A.    Probably six.

9     Q.    Were they engineers?

10    A.    Yes.

11    Q.    Did you go out on the job sites there?

12    A.    Yes.

13    Q.    And you supervised the workers there at

14  the job sites?

15    A.    Our staff that were there, yes.

16    Q.    And to do, I guess, the actual manual

17  labor, you would contract with a contracting

18  company?

19    A.    It would depend.

20    Q.    Did you or your six people do any of the

21  manual type labor involved?

22    A.    Yes.

23    Q.    What manual labor did you do while you

24  were there?

25    A.    Assessing the system, which included

1 opening up manhole covers, inspecting building

2 plumbing, doing percolation testing in the field.

3      Q.   Is it a fair statement that your

4 responsibilities were to ensure that everyone was

5 doing what they were supposed to so that the job

6 would meet the specifications that you were trying

7 to provide?

8      A.   Yes.

9      Q.   How long did you work at Engineering

10 Solutions?

11      A.   About six years.

12      Q.   Until 2005?

13      A.   I believe so.

14      Q.   Did you, at Engineering Solutions, did

15 you have any job responsibilities dealing with

16 enforcing ordinances?

17      A.   The cesspool projects that we were

18 involved in, there was a law requiring the closure

19 of large capacity cesspools.  There was a big rush

20 to convert the cesspools into compliant systems.

21 And that was the majority of the work that I was

22 doing.

23      Q.   Did you issue citations?

24      A.   We would -- we did not.

25      Q.   Did you seize any property?

32

1     A.   We did not.

2     Q.   What did you do in 2005?

3     A.   Returned back with CH2M Hill.

4     Q.   Were your triplets grown enough where

5  you could leave?  Or did they accommodate you in

6  Honolulu?

7     A.   Both.

8     Q.   So you didn't have to travel anymore

9  after that?  Or more rarely?

10    A.   Yes.

11    Q.   Now, were your job -- was your job

12 description and duties essentially the same as you

13 had previously described at your time at CH2M

14 Hill?

15    A.   No.

16    Q.   So what did you do this time?

17    A.   The key thing was serving on a program

18 management team for the City and County of

19 Honolulu's  wastewater program.

20    Q.   Tell me what your duties in serving on

21 that program were.

22    A.   To identify a long-term program for the

23 City that they could afford, and helping the City

24 negotiate a consent decree with the US EPA.

25    Q.   All right.  How long did you serve in

33

1  that capacity, sir?

2       A.   At least two years.

3       Q.   During that time, did you cite anyone

4  for noncompliance with ordinances?

5       A.   We did not cite, but we did point out

6  where there was noncompliance.

7       Q.   To the City?

8       A.   Yes.

9       Q.   Did you seize any property during that

10  two-year period?

11      A.   No.

12      Q.   All right.  So we're at 2007 now; is

13  that correct, when you stopped doing that?

14      A.   Did that until 2009 --

15      Q.   2009.

16      A.   -- 2010 time frame.

17      Q.   So from 2005 until 2009 or 2010, that

18  was your duties at CH2M Hill?

19      A.   That was one of my main projects while I

20  was there.

21      Q.   You had other projects?

22      A.   Yes.

23      Q.   Dealing with wastewater and water

24  management?

25      A.   Yes.

1      Q.   And from the 2005 period until 2009 or

2   '10, did you issue any ordinances -- I mean did

3   you issue any citations for violations of

4   ordinances?

5      A.   No.  I forgot to mention the other big

6   program I was involved with was with the state

7   DOE.  There was about 50 schools that we converted

8   their large capacity cesspools.  As part of that

9   project was a design build operate project.  As

10   part of that project, similar to pretty much all

11   the other work we do, what we've done is when you

12   do the assessment, you're pointing out whether

13   there's noncompliances.

14      Q.   But you didn't issue any citations or

15   seize any property?

16      A.   Did not, no.

17      Q.   And how many people were you supervising

18   during these projects that you just described?

19      A.   Five to ten at any one time.

20      Q.   And then in 2010, is that when you

21   became involved with the Department of Facilities

22   Maintenance?

23      A.   No.

24      Q.   What did you do in 2010?

25      A.   Took on the special assignment with the

35

1    U.S. Army Corps of Engineers.

2         Q.   How long did that special assignment

3    last?

4         A.   Thirteen months.

5         Q.   What did you do there?

6         A.   I was a civil engineer in the Afghan

7    Engineering District North in Kabul.

8         Q.   What were your duties there, sir?

9         A.   Scoping out projects, reviewing design

10   work, and inspecting when needed.

11        Q.   And the types of projects that you dealt

12   with, were they water and wastewater systems as

13   well?

14        A.   As well as general civil.

15        Q.   General civil.  What is general civil?

16   Is that streets, roads, schools?

17        A.   General civil is grading, drainage,

18   roads, retaining walls.

19        Q.   Were you in a supervisory capacity with

20   the Army Corps of Engineers?

21        A.   No.

22        Q.   Why did you accept that assignment, sir?

23        A.   It was something I wanted to do at that

24   time.

25        Q.   Were you in Afghanistan primarily during

36

1   that time?

2        A.   Yes.

3        Q.   You returned in 2011?

4        A.   Yes.

5        Q.   When in 2011?

6        A.   I believe February.

7        Q.   During your time with the Army Corps of

8   Engineers, did you issue any citations or seize

9   any property?

10       A.   I did not personally.

11       Q.   Now, it's fair to say that a lot of your

12  career has dealt with ensuring compliance with

13  either some sort of specifications, whether they

14  come from consent decrees or consent orders or

15  just, I guess, law generally.

16            Is that fair?

17       A.   Everything, all the work that I've been

18  involved with has to comply with some ordinance or

19  law.

20       Q.   And you as an engineer are responsible

21  to make sure it does comply with those ordinances

22  or laws?

23       A.   I have to be able to understand what we

24  have to comply with and then work towards its

25  compliance.

1     Q.   And you also have to make sure that the

2   project you're working on actually fulfills the

3   purpose it's intended to do, correct?

4     A.   Yes.

5     Q.   And that it's safe?

6     A.   Yes.

7     Q.   And you have, over the years, entrusted

8   other people to ensure compliance and safety and

9   functionality?

10     A.   Yes.

11     Q.   With your supervision ultimately, true?

12     A.   Yes.

13     Q.   And before you would entrust someone

14   with that type of responsibility, you would ensure

15   that they were trained properly?

16     A.   As best as we could.

17     Q.   And my guess is that you continued to

18   educate yourself as well throughout the years?

19          MR. NOMURA:  Objection.  Vague and

20   ambiguous.  Not quite sure what you mean by

21   educated himself.

22   BY MR. HOLCOMB:

23     Q.   Well, you've had continuing -- I mean,

24   you have done continuing research.  You've

25   probably attended seminars.  You've studied

38

1  different aspects of different projects over the

2  years?

3      A.   Yes.

4      Q.   To ensure that you were trained properly

5  to complete the project?

6      A.   Could you repeat the question.

7      Q.   To ensure that you were trained properly

8  to complete the project, the projects at hand?

9      A.   It wouldn't be training specifically for

10  any particular project.  It was just to maintain a

11  general level of --

12      Q.   Competence?

13      A.   -- competency, yes.

14      Q.   Now, your return from Afghanistan,

15  February of 2011, is that when you became involved

16  with the Department of Facility Maintenance?

17      A.   Yes.

18      Q.   And tell us how that came about.

19      A.   On one of my R&Rs back from Afghanistan,

20  I was asked to come in and talk with the mayor.

21      Q.   Who was the mayor at that time?

22      A.   Peter Carlyle.

23      Q.   And you had known him from your past

24  dealings with the City?

25      A.   No.

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

39

1      Q.    You never met him before?

2      A.    That's correct.

3      Q.    And he offered you a position with the

4   Department of Facilities Maintenance upon your

5   return?

6      A.    On my R&R, they talked to me.  And then

7   he offered me the position when I was back in

8   Kabul.

9      Q.    Had you applied, sent in a resume or did

10  anything else to try to solicit that appointment

11  or job?

12     A.    I had submitted my resume.

13     Q.    What was your understanding of the

14  duties of the Department of Facilities Maintenance

15  at that time?

16     A.    I know more than what I did then, so I

17  can't recall specifically.

18     Q.    Were you -- your title at the Department

19  of Facilities Maintenance was Director and Chief

20  Engineer, correct?

21     A.    At the Department of Facility, singular,

22  Maintenance, was Director and Chief Engineer, yes.

23     Q.    And that was true throughout the time

24  that you worked there, correct?  That was your

25  title the whole time?

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

40

```
 1        A.    When I was first appointed, it was

 2   Acting.

 3        Q.    Acting?

 4        A.    Correct.

 5        Q.    Director and Chief Engineer?

 6        A.    Yes.

 7        Q.    And then you became the actual Director

 8   and  Chief Engineer?

 9        A.    Upon confirmation, yes.

10        Q.    Confirmation by whom?

11        A.    By the City Council.

12        Q.    How long did that take?

13        A.    I believe I was confirmed in April.

14        Q.    What training did you receive to Fulfill

15   your duties at the Department of Facilities

16   Maintenance?

17        A.    I had -- we had ethics training.

18        Q.    Where was that training conducted?

19        A.    I do not recall.

20        Q.    Who trained you?

21        A.    I do not recall.

22        Q.    How long did that class or whatever

23   last?

24        A.    I don't recall.

25        Q.    Did you receive any materials from that
```

41

1  training?

2      A.   I believe so.

3      Q.   Where are those materials?

4      A.   I don't know.

5      Q.   What did you learn in that class or

6  training program?

7      A.   About our duties and also how to report,

8  reporting procedures in the process of follow-up.

9      Q.   What were your duties as represented to

10  you in this ethics training?

11      A.   Duties in what way?

12      Q.   You said you learned about your duties.

13  I'm asking you what -- how were your duties

14  defined to you?

15      A.   Well, about conflict of interest and

16  reporting.

17      Q.   When you say "reporting," you mean the

18  reporting procedures?

19      A.   Well, you know, if we didn't see

20  something that was right, who to report to.

21      Q.   Who did you report to?

22      A.   The Ethics Commission.

23      Q.   Was that an ongoing thing, or was that

24  if you saw someone at the City who is employed by

25  the City that was violating the ethics rules?  I

42

1    think I am misunderstanding what you're saying.

2        A.   It was both.

3        Q.   Other than seeing a co-worker or someone

4    else employed by the City committing an ethics

5    violation, what other types of incidents did you

6    learn how to report at this training?

7        A.   I don't recall.

8        Q.   You said the process of follow-up.

9             What does that mean?

10       A.   Contacting the Ethics Commission.

11       Q.   Other than this ethics training, did you

12   have any other training relative to your position

13   at the Department of Facilities Maintenance?

14       A.   From what I recall, it wasn't formal

15   training.  But it was more briefing by staff

16   members on what needed to be done.

17       Q.   What staff members?

18       A.   In our office in Kapolei, we had an

19   executive assistant and the division chiefs and

20   assistant chiefs.

21       Q.   And you are in charge of all those

22   people, correct?

23       A.   Yes.

24       Q.   When they would brief you, they would

25   say Director Chun, or however they addressed you,

43

1   they would say, We need these particular tasks

2   accomplished?

3        A.   Not in those words, no.

4        Q.   Well, tell me.  I'm wondering because we

5   were talking about training, and then you said the

6   briefing.

7             Was the briefing specifically for the

8   purpose of informing everyone of what tasks needed

9   to be accomplished by the Department of Facilities

10  Maintenance?

11       A.   It was these were people that had worked

12  there, briefing me on what things that needed to

13  be done or providing advice.

14       Q.   Okay.  And -- but you had no other

15  formal training?

16       A.   Not that I can recall.

17       Q.   Now, at some point, you became aware

18  that your responsibilities would entail enforcing

19  Bill 54, which is the Stored Property Ordinance.

20            Do you recall that?

21       A.   We were one of several departments, yes.

22       Q.   And how did you learn that information?

23       A.   I don't recall.

24       Q.   And did you have any training regarding

25  enforcement of Bill 54?

44

1      A.    I can recall at least one training

2   session, yes.

3      Q.    When was that?

4      A.    I can't recall.

5      Q.    Who was the instructor?

6      A.    We had corporation counsel.

7      Q.    Who with the corporation counsel was

8   your instructor?

9      A.    I can't recall.

10     Q.    How long did that training last?

11     A.    I can't recall.

12     Q.    What did you learn at that training

13   session?

14     A.    We reviewed over the process and general

15   procedures.

16     Q.    Did you receive any materials from that

17   training?

18     A.    I think at that time, we saw the

19   notification stickers and the follow-up notice of

20   impoundment.

21     Q.    So the forms that you would leave is

22   what you saw?

23     A.    Yes.

24     Q.    Now, you said that they reviewed the

25   process and the general procedures; is that

45

1  correct?

2      A.   Yes.

3      Q.   Did those procedures and process include

4  seizing of untagged items?

5      A.   Could you repeat the question.

6      Q.   Did the process and general procedures

7  that you learned in that training class, did that

8  include the seizing of untagged or items that had

9  not been tagged with notice 24 hours before the

10 seizure?

11     A.   Could you please define what you mean by

12 "tagged."

13     Q.   Well, let's go through it.  You learned

14 in that class that you would be placing a notice

15 on property that was --

16          (Whereupon, a secretary briefly entered

17 the room.)

18 BY MR. HOLCOMB:

19     Q.   You learned in that training that you

20 would be going to different sites on the island

21 and placing a notice or affixing a notice on

22 certain property that was believed to be violating

23 the stored property ordinance?

24     A.   No.

25     Q.   Okay.  You would place these -- you

46

1   would place notifications on property that was on

2   a sidewalk?

3        A.    We would place it on some items.

4        Q.    Which items?

5        A.    The larger items, to give the owner

6   notification that their property was under notice.

7   There wasn't a notice or a sticker put on every

8   little item.

9        Q.    So what is a larger item?

10        A.    A bike, tent, box, chairs that were

11   outside and exposed.

12        Q.    Ultimately, you or the people out there

13   under your supervision would decide whether

14   something was a larger or smaller item.

15             Is that true?

16        A.    Could you repeat the question.

17        Q.    When you went to these sites, I mean it

18   was up to you guys, you and the people that were

19   working with you, to determine which items to tag

20   and which not to tag.

21             Is that fair?

22        A.    Could you define "tagging" again.

23        Q.    I'm sorry.  Which items you would leave

24   notice on.  And if I say "tagged," I mean leaving

25   on the item, the 24-hour notice.


CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

47

1      A.   By leaving notice, there's two ways that

2  we did it.  One was with the ticket and one was

3  with the sticker.  So could you please clarify

4  what you mean by "notice."

5      Q.   What I'm going to ask you is:  What is

6  the difference between the ticket and the sticker?

7      A.   What we would best try to do is to break

8  up the property in to what we thought were owned

9  by a one individual or group of individuals.  And

10  we would give that group, grouping of property, a

11  ticket.  Any of the large stuff that we thought

12  were attached to that group was given a sticker.

13      Q.   So the smaller stuff, you tagged with a

14  ticket, and the larger stuff you tagged with a

15  sticker?

16      A.   No.

17      Q.   Then what did you do?

18      A.   For example, if there was a tent, there

19  was a bike leaning against the tent, and there

20  were a couple of other things in the front of the

21  tent, we would place the ticket on the tent.  And

22  that ticket number would be coordinated with the

23  stickers, that ticket number would be written on

24  the stickers and put it on the larger items around

25  that area to give that owner notice that their

48

1  items were under notice.

2       Q.   Okay.  And on that ticket, you would

3  list the different items that that ticket applied

4  to?

5       A.   As best as we could.  We also took

6  visual pictures that we used during enforcement.

7       Q.   So you have pictures of the items that

8  you were placing, whether a ticket or sticker on,

9  you had pictures before you put those tickets or

10 stickers on?

11      A.   It was generally after the items were

12 stickered they would take the pictures.  And it

13 was pretty much of everything.  Because, as I

14 said, we couldn't sticker or notice every little

15 item.

16      Q.   Is that the procedure that you learned

17 in the class from corp. counsel?

18      A.   Essentially, yes.

19      Q.   Were there any differences in the

20 procedure that you did and what you learned from

21 corp. counsel?

22      A.   No.

23      Q.   All right.  Now, once you had ticketed

24 or placed a sticker on items, you would go back

25 the next day?

49

1    A.   After 24 hours.

2    Q.   Which would be the next day?

3    A.   Not necessarily.

4    Q.   You would go back sometime after 24

5  hours?

6    A.   Yes.

7    Q.   How long after 24 hours?

8    A.   Two or three days at the longest.

9    Q.   So sometime within the next day or two

10  or three days after you had placed that notice on

11  there?

12    A.   Yes.

13    Q.   Now, the smaller items that were not

14  tagged with the sticker or the ticket, you would

15  nevertheless, seize those items upon your return?

16    A.   The bigger items, if they appeared in

17  the picture, yes.

18    Q.   What about the smaller items that you

19  had not placed a sticker or ticket on?

20    A.   If they were strewn about, we would take

21  those items as well.

22    Q.   What if they were inside a tent?

23    A.   The general procedure if the tent was

24  given notice, the tent and its contents was

25  removed.

50

1     Q.   And who taught you that procedure?

2     A.   That was in the training session.

3     Q.   Now, what about items that you deemed

4 are dangerous?  Were you authorized to take those

5 items without notice?

6     A.   If we were out there and we saw

7 something that was a health and safety issue, we

8 would take those items.  I don't recall in

9 particular what we did; but we would.

10    Q.   Are signs health and safety issues?  Are

11 those health and safety issues?

12    A.   Can be.

13    Q.   Under what circumstances?

14    A.   There could be a trip hazard.  They

15 could fall onto somebody.

16    Q.   And you seized signs before without

17 notice?

18    A.   There was a one sign that was mentioned.

19 And I can't recall if it was given a sticker or

20 notice, but it was a Tulsi Gabbard sign.

21    Q.   You have seized signs before without

22 them being tagged?

23    A.   That's the only one I can recall.

24    Q.   Did these procedures and process that

25 you learned from corp. counsel include destroying

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

1  property rather than storing it?

2       A.   Yes.

3       Q.   And under what circumstances did corp.

4  counsel tell you you were allowed to destroy

5  rather than to store the property?

6            MR. NOMURA:  Objection.  I'm going to

7  object to that as being vague and ambiguous.  And

8  to the extent that any response by Mr. Chun may

9  divulge any attorney/client communication, Mr.

10  Chun had testified that he received some training

11  which corp. participated in.  But if he's going to

12  be asked to testify as to what corp. advised or

13  didn't advise, I am going to instruct him not to

14  answer.

15  BY MR. HOLCOMB:

16       Q.   All right.  During this training session

17  that you recall having attended for Bill 54 and

18  the implementation thereof, were you instructed

19  that you could destroy rather than store property?

20

21            MR. NOMURA:  Objection.  Vague and

22  ambiguous.  And to the extent that it calls for a

23  response by Mr. Chun to divulge any

24  attorney/client communication, I'm going to

25  instruct him not to answer.

52

1      Q.   Mr. Chun, when did corp. counsel first

2   start representing you personally?

3      A.   I can't recall.

4      Q.   But it was upon the filing of this

5   lawsuit, correct?

6      A.   I think in my official capacity with the

7   City, they were also representing me as well.

8      Q.   Your official capacity has been

9   dismissed.

10          Were you aware of that?

11     A.   Yes.

12     Q.   And you're here individually.

13          Are you aware of that?

14     A.   Yes.

15     Q.   So my question was:  When did corp.

16   counsel begin representing you individually?

17          MR. NOMURA:  Let me -- I'm not trying

18   to testify on Mr. Chun's behalf.  But let me just

19   see if this explanation can assist Mr. Holcomb

20   with this line of questioning.

21          Whenever a City employee, be it current

22   or former City employee, is served with a

23   complaint in either his official or personal

24   capacity, an inquiry is made to the Office the

25   Department of Corporation Counsel to determine

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

53

1   whether or not the conduct alleged falls within

2   the course and scope of that employee's

3   employment.

4             And to the extent that that

5   determination is made that it fell within the

6   course and scope of his employment, then that

7   individual will be represented by corporation

8   counsel's office.  And that is something that's

9   subject to or is done pursuant to City ordinance.

10  That would be City charter.

11            Mr. Chun, upon being served with the

12  complaint, that inquiry was made.  And as a

13  result, corporation counsel does represent Mr.

14  Chun in the capacity by which he's being sued in

15  this lawsuit.

16            MR. HOLCOMB:  All right.  Fair enough.

17  BY MR. HOLCOMB:

18       Q.   You heard your lawyer's answer, correct?

19       A.   Yes.

20       Q.   And you agree that that's true, correct?

21       A.   Yes.

22       Q.   At this training session that you dealt

23  with for Bill 54 compliance, were you then

24  represented by corporation counsel?

25       A.   Could you repeat the question.  Rephrase

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

54

1    the question.

2         Q.   All right.  We can agree that you've

3    testified that you attended a training session

4    regarding the Bill 54 enforcement or the Stored

5    Property Ordinance enforcement?

6         A.   Yes.

7         Q.   At the time that you attended that

8    training session, were you represented by

9    corporation counsel?

10        A.   Yes.

11        Q.   You were.

12             Individually?

13        A.   In my official capacity.

14        Q.   Were you individually, Westley Chun,

15   represented by corporation counsel at that time?

16             MR. NOMURA:  Let me object.  Vague and

17   ambiguous.  Assumes facts not in evidence.   I

18   think to the extent that Mr. Chun attended this

19   meeting in his capacity as an employee of the City

20   and County of Honolulu, and as such, any City

21   employee would be represented in his or her

22   capacity as an employee by the Department of

23   Corporation counsel, then yes, the Department of

24   Corporation counsel was representing or was Mr.

25   Chun's attorneys, as were any of the individuals

1  participating in the session.

2            I'm not saying that this training

3  session may have contained confidential client

4  communications.  However, in response to your

5  questions whether his responses may divulge any

6  attorney/client communication, I'm just giving him

7  that instruction not to divulge that kind of

8  communication.

9            MR. HOLCOMB:  What I am asking, I want

10  to limit my question specifically to what he

11  learned at this training session as did, I assume,

12  the entire class that was attending the training

13  session.

14            MR. NOMURA:  Fine.  Fair enough.

15            MR. HOLCOMB:  So I would ask Ernest

16  that  you instruct your client appropriately on

17  that then.

18            MR. NOMURA:  I think he understands.

19  But I think, you know, I think there's some

20  concern on Mr. Chun's part that in response to

21  your question, at least in this area whether that

22  was as a function of attorney/client

23  communication, which our position is it is

24  confidential, but if this is part and parcel of

25  his general training about the enforceability,

56

1    then fine, go ahead and answer.

2              But you're going to have to let me know

3    if the extent that your response may divulge

4    attorney/client communication, then I will tell

5    you, Do not answer.

6              THE DEPONENT:  Okay.

7    BY MR. HOLCOMB:

8        Q.   If you need to consult with him Mr. Chun

9    before you answer a question, feel free to do so.

10

11             MR. NOMURA:  Fair enough.

12   BY MR. HOLCOMB:

13       Q.   I'm talking about this specific training

14   class you referred to.

15             You understand that?

16       A.   Yes.

17       Q.   Now, at that training class, what were

18   you instructed as far as when it's okay to destroy

19   rather than seize or store property?

20       A.   When?

21       Q.   Yes.

22       A.   Could you repeat that again.

23       Q.   Yes.  At this training class that you

24   attended regarding Bill 54 or Stored Property

25   Ordinance enforcement, what were you instructed as

1  to when you may destroy rather than store seized

2  property?

3        A.   If it met five criteria.

4        Q.   What are those five criteria?

5        A.   And the criteria was primarily

6  structured to prevent our storage facilities, the

7  material that would be impounded, as well as

8  health and safety.

9        Q.   What are those five criteria?

10       A.   The first item is flammable.

11       Q.   What is meant by "flammable"?

12       A.   Things that we had discarded, which

13  included gasoline, included paint.

14       Q.   Okay.  So you're talking about chemicals

15  that are combustible?

16       A.   Flammable.

17       Q.   What about tents?

18       A.   The second criteria is if it was wet.

19       Q.   What about tents?  Are they flammable?

20       A.   Tents are not flammable.

21       Q.   What about signs?  Are they flammable?

22       A.   No.  If I could say the other four

23  criteria?

24       Q.   Yes, sir.  I'm going to ask you those

25  too.

58

1                    What are the other four?

2          A.    If it's wet.  If it's perishable.  So

3    sometimes the tent if it was broken, so if it was

4    wet and broken, tents would typically be discarded

5    under those criteria.  Building materials was the

6    fifth.

7          Q.    Okay.  So if a tent was wet and broken,

8    you would discard it?

9          A.    From what I recall, that would fall

10   under that criteria.

11         Q.    Not wet or broken, but wet and broken?

12         A.    It would depend.

13         Q.    So if you happen to go out on an

14   enforcement action when it rained, you could --

15   you believe you could destroy all tents?

16              MR. NOMURA:  Objection.  Calls for

17   speculation.  Assumes facts not in evidence.

18              MR. HOLCOMB:  What was the last part,

19   Ernest?

20              MR. NOMURA:  Assumes facts not in

21   evidence.

22   BY MR. HOLCOMB:

23         Q.    So your answer?  If the tent was wet --

24              MR. NOMURA:  Do you know?

25   BY MR. HOLCOMB:

59

1        Q.    If it was raining, you could destroy the

2   tents that were wet from the rain?

3        A.    I don't know.   The only tent I recall --

4   there's only two tents I recall being destroyed.

5        Q.    But I'm asking you under that criteria,

6   if it were raining, then the tents could all be

7   destroyed that were wet from the rain?

8            MR. NOMURA:   Objection.   Misstates

9   testimony.   Calls for speculation.   Vague and

10  ambiguous.

11  BY MR. HOLCOMB:

12       Q.    That's what you learned as far as the

13  criteria, correct?

14           MR. NOMURA:   Same objections.

15  BY MR. HOLCOMB:

16       Q.    That's what you learned as far as the

17  criteria, correct?

18           MR. NOMURA:   You can respond if you

19  know.

20       A.    As I said, the only two tents I know

21  that were destroyed that I know with certainty,

22  one was Madori's tent because it posed a health

23  and safety issue.   The second one was Lucas

24  Miller's tent because he was using it as a weapon.

25  BY MR. HOLCOMB:

60

1        Q.    According to the criteria that you

2    learned, if the tent was wet, you could destroy

3    it?  Is that true?

4                  MR. NOMURA:  Same objection.  Vague and

5    ambiguous.  Misstates testimony.  Assumes facts

6    not in evidence.  Calls for speculation.

7    BY MR. HOLCOMB:

8        Q.    Is that what you learned, Mr. Chun?

9        A.    As I said, I only know of two tents

10   being destroyed.

11       Q.    I know.  I'm asking you what you

12   learned.  We'll get into what was destroyed.

13       A.    It would depend.

14       Q.    It would depend on what decision you

15   made, correct?

16       A.    No, no.

17       Q.    What would it depend upon?

18       A.    It would depend on the people that were

19   going through the material at that time.

20       Q.    What people that were going through the

21   material?

22       A.    The City workers.

23       Q.    So the City worker would make the

24   decision as to whether it was wet and should be

25   destroyed?

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

1      A.   In general.

2      Q.   And that you're in charge of the City

3   workers.

4           Is that true?

5      A.   I would be responsible for the City

6   workers in my department.

7      Q.   And they go through the materials?

8      A.   Not necessarily.

9      Q.   Sometimes?

10     A.   It depends.

11     Q.   Depends on what?

12     A.   If it's in the parks, it's the

13   responsibility of Parks and Rec.  If it's private

14   property, it's the responsibility of HPD.

15     Q.   And if it's on the sidewalks, it's the

16   responsibility of the Department of Facilities

17   Maintenance?

18     A.   Facility Maintenance, yes.

19     Q.   Your department?

20     A.   Yes.

21     Q.   Your workers would go through the

22   material that was on sidewalks?

23     A.   Not necessarily.

24     Q.   But they did sometimes?

25     A.   Yes.

62

1    Q.   Now, I wanted to ask you about it being

2 broken.

3              What do you mean by the tent being

4 broken?

5    A.   If the tent was -- thrown on the side.

6    Q.   If it was what?  I'm sorry?

7    A.   Thrown on the side.

8    Q.   If it was thrown on the side.

9              What does that mean?

10   A.   And the rods or whatever would have been

11 broken, or if it was ripped.

12   Q.   And who decided whether the rods were

13 broken or it was ripped enough to be destroyed?

14   A.   I don't recall of a tent being destroyed

15 except for those two.

16   Q.   So your testimony is that other than

17 those two tents, no tents were ever destroyed?

18   A.   No.  What I'm saying is that those are

19 the only two tents I recall being destroyed.

20   Q.   Did you store wet and broken tents, in

21 your experience, there at DFM?

22   A.   We could have.

23   Q.   Do you recall having done so?

24   A.   I do not recall.

25   Q.   Now, you said building materials.

63

1              What's a definition of building

2    materials?

3         A.   It would be big plywood sheets, four by

4    eight.  Pallets.  Bricks, tile, two by fours.

5         Q.   Now, some of these big plywood

6    materials, you had been out to Thomas Square and

7    saw that they had writing on those big plywood

8    sheets, right?

9         A.   Some may have, yes.

10        Q.   In your training session that you

11   referred to earlier, did you ever learn anything

12   about First Amendment protections?

13             MR. NOMURA:  Let me object to the

14   extent that any response from Mr. Chun on this

15   area may get into attorney/client communications.

16   I'm not saying that this training session that

17   involved other departments, including the

18   Department of Corporation Counsel, is an

19   attorney/client confidential communication.

20             However, if Mr. Chun's response does

21   infringe on that privilege, I'm going to instruct

22   him not to answer.  And if he can respond to this

23   question without divulging, in his mind,

24   attorney/client communication, then he's free to

25   respond to that question.

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

64

1  BY MR. HOLCOMB:

2      Q.   Let me restate the question, Ernest.

3           My question was:  In this one specific

4  training session regarding the Bill 54

5  enforcement, did you learn anything about First

6  Amendment protections?

7      A.   I can't recall.

8      Q.   And what items might be protected by the

9  First Amendment?

10     A.   As I said earlier, I can't recall.

11     Q.   Did you ever, after that training

12  session, learn anything about First Amendment

13  protections or items that might be protected by

14  the First Amendment?

15          MR. NOMURA:  Same objection.

16     A.   I can't recall.

17  BY MR. HOLCOMB:

18     Q.   After this training session, how long

19  was it before you began these seizures?

20     A.   What do you mean by seizures?

21     Q.   I'm sorry.  These Sidewalk or the Stored

22  Property Ordinance Enforcement actions.

23     A.   I can't recall.

24     Q.   Do you know what year that training

25  session occurred?

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

65

1     A.    It would have to have been shortly after

2   the bill passed.

3     Q.    Had you done any seizures before you

4   attended that training session?

5     A.    I do not believe so.

6     Q.    Now, you said that some of the larger

7   items that you would tag, you gave several

8   examples, one being a bike; is that true?

9     A.    In my example, yes.

10     Q.    And you guys have seized bicycles

11   before?

12     A.    Yes.

13     Q.    Pursuant to Bill 54?

14     A.    Yes.

15     Q.    And the Stored Property Ordinance?  Yes?

16     A.    Yes.

17     Q.    Now, I want to ask you this:  We had

18   talked about earlier in your engineering capacity

19   that you wanted to make sure that the employees

20   under you were trained properly in order that they

21   may do the job properly.

22         Do you recall that?

23     A.    Could you repeat that, please.

24     Q.    Before you joined the Department of

25   Facilities Maintenance, we had talked about the

66

1  people that you supervised, and you made sure they

2  were trained properly so that they might safely

3  and productively do the jobs that were set before

4  them.

5           Do you recall that?

6       A.    Trained as best as they could.

7       Q.    What training did you give to the people

8  under you at the Department of Facilities

9  Maintenance to ensure that they could conduct

10  these SPO enforcement actions?

11      A.    As I mentioned, I could recall at least

12  that one training session.

13      Q.    But you didn't do anything separate from

14  that?

15      A.    Not me individually, no.

16      Q.    Did anyone else?

17      A.    I can't recall.

18      Q.    So you don't know?

19      A.    Not offhand.

20      Q.    Do you recall having any other -- other

21  than this one class that we talked about, do you

22  recall having any other training regarding stored

23  property ordinance or seizure of people's property

24  pursuant to those ordinances?

25      A.    I can't recall.

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

67

1      Q.   So that's the only one that you remember

2  ever having?

3      A.   That's the only one I remember

4  attending, yes.

5      Q.   In your capacity of conducting these

6  stored property ordinance enforcement actions,

7  were you operating under any policies issued to

8  you from the City?

9           MR. NOMURA:   Objection.  Vague and

10 ambiguous.  Calls for a legal conclusion.  I don't

11 know if you know how to respond to that question.

12 If you do, go ahead and respond to it.

13     A.   Could you rephrase the question, please.

14

15 BY MR. HOLCOMB:

16     Q.   Were you operating pursuant to any City

17 policies when you were in charge of conducting

18 these stored property ordinance enforcement

19 actions?

20     A.   I don't understand what you mean by

21 "policies."

22     Q.   Did you receive any direction from the

23 City as to how to go about doing this?

24     A.   What we did was this program was

25 complaint driven.  As the different departments

68

1  received complaints about private property stored

2  on City property.  That information was compiled

3  by the City's Office of Housing.

4           The Office of Housing would then

5  prioritize areas of enforcement and would

6  coordinate with times of when we would start the

7  enforcement actions.

8       Q.   As to the actual conducting of the

9  enforcement action, did you have any policies that

10  governed those procedures?

11       A.   Regarding the enforcement action and the

12  policies?  The only thing was, as I said, when we

13  would discard items at the time of impoundment.

14  And the only other thing that we would do is just

15  at Thomas Square, because of the interaction of

16  the people that were there, we taped off the area

17  during the time of enforcement.

18       Q.   Is that the extent of the policies that

19  governed your actions?

20       A.   Could you rephrase that question.

21       Q.   Yes.  Are those all of the policies that

22  were in place to govern your actions in conducting

23  these SPO enforcement actions?

24           MR. NOMURA:  Same objection.  Vague and

25  ambiguous.  Calls for speculation.  Calls for a

1  legal conclusion.

2  BY MR. HOLCOMB:

3      Q.   Let me rephrase it even further.

4           Those items you just listed, are they

5  the only policies that you are aware of that

6  governed your actions in conducting these SPO

7  enforcement actions?

8      A.   I don't understand the question.

9      Q.   Stated otherwise, are you aware of any

10 other policies other than those two that you

11 listed regarding destruction of property, those

12 two items that you listed, were there any other

13 policies to your knowledge, that governed your

14 actions in conducting these enforcement actions?

15          MR. NOMURA:  Same objections.

16 Misstates prior testimony.  Vague and ambiguous.

17     A.   I don't know how to answer.

18 BY MR. HOLCOMB:

19     Q.   I'm sorry.  I'm probably saying it very

20 confusing.

21          When I asked you about policy, you said

22 there was one regarding destruction of property.

23 We went through that, I assume, the five criteria,

24 correct?

25     A.   Yes.

1      Q.   My question is:  Are there any other

2  policies that were in place other than that that

3  governed your actions as Director of Department of

4  Facilities Maintenance when you conducted these

5  SPO enforcement actions?

6           MR. NOMURA:  Same objections.  Vague

7  and ambiguous, misstates prior testimony, calls

8  for a legal conclusion.  You know, just to -- I

9  don't want to interject unnecessarily.  But Mr.

10  Chun had testified regarding the SPO enforcements

11  as being complaint driven, as Housing being the

12  coordinator, prioritizing areas of enforcement,

13  the times of enforcement actions, et cetera.

14           And I think that was an attempt to

15  respond to Mr. Holcomb's question.  So to the

16  extent that Mr. Chun has done anything else that

17  he wants to add to respond to Mr. Holcomb's

18  questions, then by all means, please do so.

19           MR. HOLCOMB:  That should be my

20  question.

21  BY MR. HOLCOMB:

22      Q.   Is there anything else, other than those

23  things you listed?

24      A.   There may be, but I can't recall.

25      Q.   Those are the only ones that you're

1  aware of?

2       A.   That I recall at this time.

3            MR. HOLCOMB:   Could we have a brief

4  time out?

5            MR. NOMURA:   Sure.

6            (Whereupon, a recess was taken.)

7  BY MR. HOLCOMB:

8       Q.   Mr. Chun, are you aware of things that

9  had been taken and notices were not left after

10  they were taken?

11      A.   I don't know.

12      Q.   The things that you destroyed, did you

13  leave notices about those?

14      A.   I don't recall.  I don't know.

15      Q.   You were the supervisor, basically, at

16  the Department of Facilities Maintenance, correct?

17      A.   I was the Director and Chief Engineer.

18      Q.   But you were the Supervisor of that

19  department?

20      A.   I was the head of that department.

21      Q.   Did you supervise that department?

22      A.   I supervised our Division Chiefs.

23      Q.   And you delegated your authority through

24  the Division Chiefs?

25      A.   That's correct.

1      Q.    So you were the head and you had the

2  full supervisory capacity there?

3      A.    Could you repeat the question.

4      Q.    You were the head of all the Chiefs,

5  correct?

6      A.    I was the head of the department, yes.

7      Q.    And all of the Division Chiefs?

8      A.    The Division Chiefs reported to me, yes.

9      Q.    And, in fact, ultimately, everybody

10  there reported to you?

11      A.    That's correct.

12      Q.    And you made decisions as to what they

13  should do, those under you?

14          MR. NOMURA:  Objection.  Vague and

15  ambiguous.

16      A.    Could you rephrase the question, please.

17

18  BY MR. HOLCOMB:

19      Q.    You made decisions as to what functions

20  that those people under you should undertake?

21          MR. NOMURA:  Same objection.  Vague and

22  ambiguous.  Calls for speculation.

23  BY MR. HOLCOMB:

24      Q.    Who made the decisions as to what tasks

25  the  Division Chiefs and the employees at the DFM

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

73

1    should undertake?

2         A.   Well, we had like, a City Charter that

3    specified responsibilities of the different

4    divisions.

5         Q.   Uh-huh (affirmative).

6              Does the City charter a person?

7         A.   But it was something that we -- it's not

8    a person, no.

9         Q.   So my question was:  Who made those

10   decisions?

11        A.   Could you repeat that, rephrase the

12   question.

13        Q.   Well, I mean, I rephrased it.

14             Do you not want to answer the question?

15

16             MR. NOMURA:  No, I think the concern is

17   it's vague and ambiguous.  It's overly broad.  I

18   think the of Department of Facility Maintenance, I

19   don't know how many employees that run the gamut

20   from the executive, management employees down to

21   the rank and file employees and anywhere in

22   between, you have Collective Bargaining Agreements

23   from various unions.

24             And so there is a whole bunch of --

25   that kind of question, Mr. Holcomb, impacts a lot

1  of issues.  That's, I think that's one of the

2  reasons why Mr. Chun, I believe, is having

3  difficulty responding to that broad of a question.

4

5      A.   Maybe if I could just say this:  The

6  Department has 850 staff positions.  And as I

7  said, I primarily worked with the Division Chiefs

8  and Assistant Chiefs.

9  BY MR. HOLCOMB:

10     Q.   Okay.  How many of those 850 employees

11  would participate in the SPO enforcement actions?

12     A.   I can't recall.

13     Q.   And who -- in completing tasks dealing

14  with the SPO enforcement action, you are the

15  person that made those decisions, correct?

16     A.   Could you repeat that.

17     Q.   Well, who assigned the employees to go

18  out there?

19     A.   The Division Chief.  Roads Maintenance

20  Division.

21     Q.   Under your instruction?

22     A.   Under our instruction of when we were

23  going to do the enforcement.

24     Q.   Which you decided?

25     A.   As I said earlier, the office, Mayor's

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

75

1  Office of Housing was the one, based on the

2  complaints and the follow-ups that we would do

3  would make the scheduling of the enforcement.

4       Q.   What decisions did you make?  Any?  They

5  didn't just give you a title and mail you a check

6  every two weeks?

7       A.   No.

8       Q.   Is that what they did?

9       A.   No.

10      Q.   And obviously, with 850 employees,

11  somebody has to be making decisions.

12      A.   Yes.

13      Q.   And in your experience, you found that

14  to be true?

15      A.   Yes.

16      Q.   And that was your role at the DFM?

17      A.   I was the head of that department.  I

18  would defer a lot to our Division Chiefs and

19  Assistant Chiefs.  There is no way you can run a

20  department that large micromanaging.

21      Q.   But when you defer to your Division

22  Chiefs, you are the one that made the decision not

23  to micromanage whatever particular task you were

24  talking about?

25      A.   Yes.

76

1     Q.   And you and those under you were

2  responsible for record keeping when conducting

3  these Stored Property Ordinance enforcement

4  actions?

5     A.   For the portion that we were involved

6  with.  As I said, there were several departments.

7     Q.   But the tickets or stickers that you

8  placed on property before it was seized, you and

9  the DFM were responsible for keeping track of

10 those, right?

11    A.   Not necessarily.

12    Q.   What did you do with them?  You made

13 copies of them, right?

14    A.   The booklet that we had, the tickets had

15 a duplicate -- I think it was a triplicate copies.

16    Q.   So it was like carbon copies?

17    A.   Correct.

18    Q.   You were responsible, or the DFM was

19 responsible for keeping those carbon copies?

20    A.   The ones that we wrote up, yes.

21    Q.   And likewise, when you would leave a

22 notice that something had been seized, you were

23 responsible for keeping those records as well?

24    A.   For the notices that we wrote, yes.

25    Q.   And going back -- and I'm sorry to jump

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

1  around, but I missed something -- how many people

2  attended that training session that you went to?

3      A.   I can't recall the exact number, but it

4  was in our main conference room at our Halawa

5  yard, and that room was full.

6      Q.   How big is that conference room?

7      A.   My guess is 40 to 60.

8      Q.   Were all 850 DFM employees there?

9      A.   No.  Because not all of them are -- not

10 all of the employees are part of road maintenance,

11 and in particular, the area that is responsible

12 for the SPO enforcement.

13     Q.   So there's a division of the DFM called

14 Road Maintenance; is that true?

15     A.   Yes, Road Maintenance Division.

16     Q.   Road Maintenance Division.

17          And they were responsible for the SPO

18 enforcement actions?

19     A.   Yes.

20     Q.   And more specifically, a division within

21 the Road Maintenance Department was responsible

22 for the SPO enforcement actions?

23     A.   Well, our Road Maintenance Division has

24 many different yards.  So it was primarily staffed

25 from our Halawa yard that participated.

78

1    Q.   Were all of those employees there at

2  that training session?

3    A.   No, because not all of them participated

4  in the SPO enforcement.

5    Q.   Were all of the employees who ever

6  participated in the SPO enforcement, under your

7  time there as the Director, were they there at

8  that training session?

9    A.   The best that I know, yes.

10   Q.   And how many of these SPO enforcement

11  actions have you personally participated in?

12   A.   I can't recall.

13   Q.   Is it 10?  More than 10?

14   A.   It could be more than 10.

15   Q.   More than 20?

16   A.   I'm not sure.

17   Q.   Between 10 and 20?

18   A.   It could be.

19   Q.   Could it be 100?

20   A.   No.

21   Q.   Could it be 50?

22   A.   I don't know.

23   Q.   How many of those SPO enforcement

24  actions have you participated in at Thomas Square?

25   A.   I can't recall.

79

1        Q.   Could it be 10?

2        A.   Possibly.

3        Q.   More than 10?

4        A.   Possibly.

5        Q.   Twenty?

6        A.   I don't know.

7        Q.   Do you recall on April 13 -- I'm sorry,

8   April 12 of 2013, you had signed a Declaration?

9   Do you recall that?  I think we have that marked

10  as one of the exhibits.

11            I'm sorry.  We'll mark this as exhibit

12  next in order.

13            (Whereupon, a Declaration was marked as

14  Exhibit 13 for Identification.)

15       A.   This particular copy, yes, of 2013.

16  BY MR. HOLCOMB:

17       Q.   Do you recall having signed that

18  Declaration?

19       A.   Yes.

20       Q.   Is everything in that Declaration true?

21       A.   To the best of my knowledge, yes.

22       Q.   Now, you refer in that Declaration to

23  exhibits that were attached.

24            Do you recall that?  For example, in

25  Paragraph 10 you refer to Exhibits 12-A and 12-B.

1

2      A.   Yes.

3      Q.   Now, specifically on Paragraph 10, you

4  say, "Attached hereto as Exhibit 12-A are true and

5  correct copies of the removal notices issued on

6  that day, speaking of February 14, 2012."

7      A.   Yes.

8      Q.   And those are true and exact copies of

9  the removal notices that were issued on February

10  14th, correct?

11      A.   As best as I know, yes.

12      Q.   Were there any others issued,

13  particularly at Thomas Square, on February 14th?

14      A.   I am not sure.

15      Q.   At some point, you had gone through the

16  removal notices and picked out the ones that you

17  thought were relevant, correct?

18      A.   I'm not sure.

19      Q.   Then you wrote the next day, February

20  15, 2012, "City personnel impounded and stored the

21  tagged personal property that had not been removed

22  from the day before.  Attached hereto as Exhibit

23  12-B are true and correct copies of the Storage

24  and Disposal Notices issued on that day."

25           Do you recall that?

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

81

1        A.   I believe so, yes.

2        Q.   And, in fact, what we had marked as

3   Exhibit 3 but says "Exhibit 12-B" on the cover

4   sheet are the true and exact copies of the Storage

5   and Disposal Notices issued on February 15, true?

6

7        A.   I believe so, yes.

8        Q.   March 29, 2012 is specifically, Ernest,

9   we're looking at Paragraph 12.  You wrote, "On

10  March 28, 2012, City personnel tagged several

11  personal properties that were located the

12  sidewalk.  Attached hereto as Exhibit 13-A are

13  true and correct copies of the Removal Notices

14  issued on that day."

15           And you had those marked as 13-A.  We

16  have those marked as Exhibit 4 to this deposition.

17

18           Do you recall having stated that, sir?

19       A.   Yes.

20       Q.   And you're looking through there now.

21           Are those true and exact copies of the

22  Removal Notices issued on March 28th?

23       A.   As best as I know, yes.  Some of them

24  say March 29th.

25       Q.   The ones that are marked March 28th,

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

82

1  however, that statement is true, correct?

2      A.   I believe so, yes.

3  Then you say, "The next day, March 29th, City

4  personnel impounded and stored the tagged personal

5  property that had not been removed from the day

6  before.  Attached hereto as Exhibit 13-B are true

7  and correct copies of the Storage and Disposal

8  Notices issued on that day."

9          Do you recall having stated that in

10 your Declaration, sir?

11     A.   I believe so, yes.

12     Q.   And we have Exhibit 13-B marked as

13 Exhibit 5 for this deposition.

14          Is that a true and correct copy of the

15 Storage and Removal Notices or Storage and

16 Disposal Notices issued on that day?

17     A.   I'm not sure.

18     Q.   You don't know?  Let me ask you this:

19 If they were filed in the court as Exhibit 13-B at

20 the time you -- let me ask you this way:  At the

21 time you made this Declaration you did know,

22 correct?

23     A.   As best as I could, yes.

24     Q.   Or you wouldn't have sworn that it was

25 true, correct?

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

83

1      A.   Correct.

2      Q.   So whatever is attached as Exhibit 13-B,

3  you would agree with me are true and correct

4  copies of the Storage and Disposal Notices issued

5  on March 29th?

6      A.   If this is Exhibit 13-B in its entirety,

7  yes.

8      Q.   So the entire Exhibit 13-B would be the

9  entirety of the Storage and Disposal Notices

10  issued on that date, correct?

11      A.   I believe so, yes.

12      Q.   Now, was there a Storage and Removal

13  Notice issued for what you had said earlier was

14  Madori's tent on March 29th?

15      A.   Removal Notice?

16      Q.   Yes, sir.

17      A.   I'm pretty sure that there was one.

18      Q.   And you'll be able to provide that for

19  me?  Not the Removal Notice.  I'm talking about

20  the Storage -- because Removal Notices are March

21  28th.  I mean the Storage and Disposal Notice from

22  March 29th,  13-B.

23      A.   No.  The Storage and Disposal Notice was

24  just to notify individuals that their property was

25  impounded, taken away, and where they could

84

1   recover it, how they could recover their property.

2                 In Madori's instance, the tent was

3   destroyed, removed.

4        Q.   So there was no Storage and Disposal

5   Notice issued on that day, correct?

6        A.   No, not the items that we've thrown away

7   would we post the notice.

8        Q.   Now, you had written on there, you

9   "specifically recall a tent was hanging over the

10  walkway from one of the trees.  Based on placement

11  of the tent, it was clear to me that the tent was

12  not being used for its intended purpose, posed a

13  hazard to pedestrians and park users below, and

14  accordingly, was disposed of under these

15  circumstances."

16                 You recall having written that?

17       A.   Yes.

18       Q.   That's true, to the best your knowledge?

19       A.   Absolutely true.

20       Q.   When you said, "Disposed of under these

21  circumstances," you meant it was put in the

22  garbage truck, correct?

23       A.   Yes.

24       Q.   And it was then crushed by the operation

25  of the garbage truck?

85

1      A.    In this particular instance, I remember

2    that specifically, because that tent was up high

3    in the tree.  We, at one time, we were thinking of

4    using a -- bringing in a cherry picker to remove

5    it.

6      Q.    The June 28th -- we're now on Paragraph

7    14 of your Declaration, sir.  He had written,

8    "Again stored personal property on public property

9    was tagged and Notices of Removal were affixed to

10   the items.  Attached hereto as Exhibit 14-A are

11   true and correct copies of the notices issued on

12   that day,"  correct?

13     A.    I believe so, yes.

14     Q.    There you were referring to the 25th,

15   26th  or 27th of June, correct?

16     A.    Yes.

17     Q.    We have 14-A marked as Exhibit 6 here

18   today, correct?

19     A.    Yes.

20     Q.    Are those true and exact copies of the

21   Notices that you referred to in your Declaration

22   here?

23     A.    Yes, I believe so.

24     Q.    "On June 28, 2012, City personnel

25   impounded and stored tagged personal property that

86

1  had not been removed in the days before, attached

2  hereto as Exhibit 14-B, which we have marked as

3  Exhibit 7 for this deposition."

4          Those are true and correct copies of

5  the Storage and Disposal Notices issued on June

6  28th, correct?

7      A.   Yes, I believe so.

8      Q.   Then on August 8th, you wrote, "Again

9  stored personal property on public property were

10  tagged and Notices of Removal were affixed to the

11  items.  Attached hereto as Exhibit 15-A, which we

12  have tagged as Exhibit 8 to this deposition, are

13  true and correct copies of the Notices issued on

14  that day."

15          Is that true?

16      A.   Yes.  I believe so.

17      Q.   And "that day" refers to August 6, it

18  appears?

19      A.   Based on the record, I provided that

20  statement, but I wasn't in town during those days.

21      Q.   So on August 6th and 7th, you were not

22  there?

23      A.   Correct.

24      Q.   When these Removal Notices were tagged,

25  were placed on the property?

1      A.   Yes.

2      Q.   But you found these because you were the

3  record keeper, right?

4      A.   Based on the records that we had

5  available within our department yes.

6      Q.   And those you provided completely what

7  you had in your records, right?

8      A.   As best as we had available, yes.  And

9  as I said earlier, DFM is one of two departments

10  doing the enforcement.

11      Q.   Okay.  Who's the other department?

12      A.   Parks and Rec.

13      Q.   And then you said -- let me ask you

14  this:  If they are in that exhibit, then, I mean,

15  you believed what you said in this Declaration to

16  be true, right?  So when you said, "Attached

17  hereto as Exhibit 15-A are true and correct copies

18  of the notices issued on that day," referring to

19  August 6th and 7th, you believed that that was

20  true, didn't you?

21      A.   True.

22           MR. NOMURA:  August 6th, 7th and 8th.

23           MR. HOLCOMB:  The 8th is for the

24  impoundment notices, I think, Ernest.

25           MR. NOMURA:  The paragraph talks about

88

1    SPO enforcement taking course over three days,

2    6th, 7th and 8th.

3    BY MR. HOLCOMB:

4         Q.   But the Removal Notices were on the 6th

5    and 7th, correct?

6         A.   On the 8th, yes.

7              MR. NOMURA:   The document speaks for

8    itself.

9    BY MR. HOLCOMB:

10        Q.   On the 8th, you wrote, "On August 8,

11   2012, City personnel impounded and stored the

12   tagged personal property that had not been removed

13   from the days before.  Attached hereto as Exhibit

14   15-B are true and correct copies of the Storage

15   and Disposal Notices issued on that day."

16             And we have Exhibit 15-B marked as

17   Exhibit 9 for the purposes of this deposition.

18             Is that true?

19        A.   As best as I recall, yes.

20        Q.   Is there anything different in there

21   from what you had stated before?

22        A.   If these exhibits are complete to what

23   was referred to in the statements.

24        Q.   Your testimony is that if the complete

25   exhibit is taken out of the record of this case,

89

1   then that statement that I identified is true,

2   correct?

3        A.   Correct, yes.

4        Q.   On September 6th you wrote, "Enforcement

5   of the SPO took place over the course of four

6   days, September 5th, 6th, 10th and 11th, 2012.

7   Stored personal property on public property was

8   tagged and Notices of Removal were affixed to the

9   items.  Attached hereto as Exhibit 16 are true and

10  correct copies of the notices issued on that day."

11

12          We don't have a cover sheet for

13  whatever reason, but we got it stamped.  At the

14  bottom it says "Exhibit 16."  We have it marked as

15  Exhibit 10 here today.

16          Are those statements that you wrote in

17  Paragraph 16 of your Declaration true in regards

18  to this Exhibit 16?

19       A.   Again, if the exhibit is complete to

20  what was originally referenced, yes.

21       Q.   Now then, moving on to Paragraph 17 of

22  your Declaration, the October 9th Enforcement

23  Action.  "Enforcement of the SPO took place over

24  the course of three days, October 9th, 11th and

25  12th.  Stored personal property on public property

90

1   was tagged and Notices of Removal were affixed to

2   the items.  Attached hereto as Exhibit 17-A are

3   true and exact copies of the notices issued on

4   that," which I assume means those days.  And we

5   have that marked as Exhibit 11 for these

6   depositions.

7                Is that statement true?

8        A.   I believe so, yes.

9        Q.   You said, "Items that remained on the

10   public property for 24 hours or more were

11   impounded and stored.  Attached hereto as Exhibit

12   17-B are true and correct copies of the Storage

13   and Disposal Notices issued on that day.  And we

14   have 17-B marked as Exhibit 12 for this

15   deposition."

16                Is that statement also true?

17        A.   I believe so, yes.

18        Q.   Now, on October 9th is when this issue

19   arose about the Tulsi Gabbard sign.

20                Do you recall that?

21        A.   Yes.

22        Q.   Now, you had written in your Declaration

23   with respect to the Gabbard campaign sign on which

24   Sugar, meaning Catherine Russell -- is that true,

25   when you said "Sugar"?  I'm on Paragraph 8.

1    A.   Yes.

2    Q.   "Catherine Russell painted an 'X' across

3  the candidate's name," you "contacted Mr. Dean

4  Masuno from Council Gabbard's office regarding the

5  use of the Council Member Gabbard's signs."

6         Do you recall that?

7    A.   I contacted him under his capacity as

8  the campaign committee worker.

9    Q.   But you contacted him?

10    A.   Yes.

11    Q.   When did you do that?

12    A.   The only reason why I did it was late

13  August, the incident of Caldwell's daughter

14  defacing and damaging Cayetano's sign came up.

15  And at that time, it was brought up as either a

16  theft, possession of stolen property, or -- what's

17  that other term --  destruction of personal

18  property.  Anyway -- but there were several

19  potential issues associated with that.

20         So when I saw the sign there, I made

21  the contact to the campaign office, knowing that

22  they are the rightful owners of that sign, and

23  asked Dean if the Occupy people had permission to

24  use that sign in that location and deface it with

25  an "X".

92

```
 1      Q.   And he said no?

 2      A.   Correct.

 3      Q.   And at the time that you made that phone

 4  call, you didn't know where Ms. Russell had gotten

 5  the sign, did you?

 6      A.   At that time, it would either have been

 7  stolen or possession of stolen property.

 8      Q.   You've seized items before under

 9  abandoned property, haven't you?

10      A.   We've seen stolen property out there

11  before.

12      Q.   But you've taken property, saying it was

13  abandoned before, hadn't you?  In fact, on

14  November 21st, you went to Hawaiian Braces across

15  the street and you took property, saying it was

16  abandoned property.  Do you remember that?

17           MR. NOMURA:  Objection.  Misstates

18  testimony.  Assumes facts not in evidence.

19      A.   No.

20  BY MR. HOLCOMB:

21      Q.   You don't remember having done that?

22      A.   That property was removed under the

23  Found Property Ordinance.

24      Q.   My point is you don't know where the

25  sign came from?
```

93

1        A.   Again, it was either stolen property or

2    it was -- in any event, it wasn't being used for

3    its originally intended purpose with the

4    permission of the owners of the sign.

5        Q.   I want to ask you that, about that, used

6    for its intended purpose.

7             You would agree with me the intended

8    purpose is to try to solicit the public to voting

9    for Ms. Gabbard?

10       A.   I would say in general, yes.

11       Q.   And you took the sign because it

12   appeared that they had changed it to encourage

13   people not to vote for Ms. Gabbard?

14       A.   No, not necessarily.

15       Q.   Then why did you take it?  What intended

16   purpose was being violated with -- what other

17   intended purpose could possibly have been violated

18   with it having an "X" through it?

19       A.   It was there without the campaign's

20   permission, and it was defaced.

21       Q.   And did you ask Mr. Masuno how to go

22   about tracking all the signs that they had given

23   to people?

24       A.   No.

25       Q.   Did you ask Mr. Masuno if he knew where

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

94

1  Ms. Russell had gotten the sign?

2        A.    Could you repeat the question.

3        Q.    Did you ask Mr. Masuno if he knew where

4  Ms. Russell had gotten the sign?

5        A.    I don't recall.

6        Q.    Did you ask Ms. Russell where she had

7  gotten the sign?

8        A.    At the time of enforcement, and only at

9  Thomas Square, would the City workers, including

10  myself, be verbally harassed.  So typically, when

11  we do an enforcement, we just going about, doing

12  our job.

13        Q.    My question was:  Did you ask Ms.

14  Russell where she had gotten the sign?

15        A.    I don't recall offhand.

16        Q.    And you told her about your opinion that

17  this would be theft or the other things that you

18  had listed, correct?

19        A.    I don't recall talking to her directly.

20  But I know that she was very vocal about the sign

21  initially until she heard me, overheard my

22  conversation with Mr. Masuno about it being stolen

23  property and being damaged.

24        Q.    Okay.  Do you know what happened to --

25        A.    Then after that time, she remained

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

1  silent.

2        Q.    Do you know what happened to Mayor

3  Caldwell's daughter with the Cayetano sign?

4        A.    The best that I know was Cayetano

5  decided not to press any charges, which he was

6  entitled to do.

7        Q.    Which he was entitled to do.

8              Who told you he was entitled to do

9  that?

10       A.    That's what was said in the press

11  coverage.

12       Q.    In the newspaper?

13       A.    Correct.  Which is why when we're there,

14  if we spot any illegal activity, we would do an

15  enforcement of that as well.  If there was drug

16  paraphernalia, whether we noticed it or not, it

17  would be dealt with appropriately by HPD.  If

18  there were stolen bikes that had defaced serial

19  numbers, we would report that as well.

20       Q.    But you developed your opinion that this

21  sign was stolen property, based on the reports in

22  the newspaper about Kirk Caldwell's daughter?

23             MR. NOMURA:  Objection.  Misstates

24  testimony.

25       A.    No.

96

```
 1  BY MR. HOLCOMB:

 2      Q.   Then how do you make that assumption?

 3      A.   After talking with Dean Masuno.

 4      Q.   So you talked to him and he said it's

 5  stolen property?

 6      A.   He said that it's the campaign's

 7  property and it wasn't being used for its intended

 8  purposes and he wanted the sign removed.

 9      Q.   Did it have any identifying markings to

10  tell it from the other -- to distinguish it from

11  the other hundreds of signs used by the Tulsi

12  Gabbard campaign?

13      A.   I don't recall.

14      Q.   Did it have like, a model number or an

15  identifying number on it?

16      A.   As I said earlier, I don't recall.

17      Q.   And did Mr. Masuno ask you for any type

18  of number like that?

19      A.   I don't believe so.  I don't recall.

20      Q.   Did you ask Mr. Masuno what they did

21  with the signs once they had them printed up?

22      A.   I don't recall.

23      Q.   But we can agree that you took the sign?

24      A.   Yes.

25      Q.   And it was not tagged with a removal
```

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

1  notice, 24 hours before?

2       A.   Could be.  I'm not absolutely sure.

3       Q.   So you don't know if it was or not?

4       A.   But as I said, we would be out there,

5  because we have the police, we have our crews.  If

6  there was any other service that we could provide

7  while we're out there, including retrieving stolen

8  property, including removing bulky items that

9  should have been picked up, we will do that.

10       Q.   Mr. Chun, you don't know whether the

11  sign was tagged or not, 24 hours before?

12       A.   No.  But it was not being used for its

13  intended purpose.  The proper owner of the sign

14  said to remove it off the premises, and that's

15  what we followed, their instruction.

16       Q.   Now, what did you do with the sign once

17  you removed it?

18       A.   I can't recall.

19       Q.   Did you give it back to Mr. Masuno?

20       A.   I can't recall.

21       Q.   Did you throw it in the trash?

22       A.   I can't recall.

23       Q.   Did you give it back to the Gabbard

24  campaign in any capacity?

25       A.   As I said, I can't recall.

98

1      Q.   Did you offer to give it back to the

2   Gabbard campaign in any capacity?

3      A.   I don't remember.

4      Q.   You didn't give it back to Catherine

5   Russell, did you?

6      A.   Could you repeat the question.

7      Q.   You did not give it back to Catherine

8   Russell?

9      A.   I do not believe so.

10      Q.   You did not impound the property?

11      A.   I don't remember.

12      Q.   Pursuant to the Stored Property

13   Ordinance?

14      A.   It was recovered stolen property.

15      Q.   You did not impound it pursuant to the

16   Stored Property Ordinance, did you?

17      A.   Yes.   It's recovered stolen property.

18   If we see a stolen bike out there, we wouldn't

19   impound it for the person that stole it.

20      Q.   That's my question:  Did you impound the

21   Tulsi Gabbard sign pursuant to the Stored Property

22   Ordinance?

23      A.   No, it was recovering of stolen

24   property.

25      Q.   Your answer was no, it was not?

1      A.    Because it was recovered stolen

2  property.

3      Q.    What do you do with like, a stolen bike?

4      A.    We would give it to the HPD.

5      Q.    Did you give the sign to the HPD?

6      A.    At this particular case, HPD was there.

7  They didn't take the sign.

8      Q.    I'm sorry?

9      A.    HPD was there.  They didn't take the

10  sign.

11      Q.    They did not take it?

12      A.    No.

13      Q.    Is that unusual for them to recover

14  stolen property and not take it?

15              MR. NOMURA:  Objection.  Calls for

16  speculation.

17  BY MR. HOLCOMB:

18      Q.    You've been out there a number of times.

19

20              You said you've seen stolen property

21  and  contraband before, correct?

22              MR. NOMURA:  He doesn't know what is

23  stolen property or contraband.

24  BY MR. HOLCOMB:

25      Q.    Have you seen stolen property and

100

1  contraband out during these SPO enforcement

2  actions?

3      A.   I've seen some, yes.

4      Q.   And HPD takes that property?

5      A.   Not all the time.

6      Q.   With the exception of the Tulsi Gabbard

7  sign, can you name an instance where HPD did not

8  take stolen property?

9      A.   Yes.

10     Q.   Tell us about that instance.

11     A.   There was furniture items put on the

12  curbside for bulky item pickup.  When it's put on

13  the curbside, it becomes City property.

14          We've had instances of reporting of

15  people that have set out property, noticing the

16  furniture items on Thomas Square.  After we

17  clearly notified the occupants of Thomas Square

18  that it would be illegal and it would be stealing

19  of City property to take any items, subsequent to

20  that warning, we've seen furniture out there

21  reported by residents that had set them out for

22  the City.

23     Q.   So, in other words, property that has

24  been discarded by its owner?

25     A.   Correct.  Curbside item bulky item

1  pickup becomes city property.  It's not for anyone

2  to pick up.

3      Q.   The owner of that property had discarded

4  it, correct, and wanted the City to pick it up?

5      A.   Set it aside.  It becomes City property,

6  yes.

7      Q.   That's the only example of stolen

8  property that you can think of where the HPD did

9  not take into possession stolen property?

10     A.   Besides the sign, yes.

11     Q.   Besides the sign, okay.

12          Now, moving on here to Paragraph 19 of

13  your Declaration, sir, November 21, 2012.  You

14  state, "Attached hereto as Exhibit 18-A are true

15  and correct copies of notices issued on that day,"

16  referring to  November 20.

17          Is that true, sir?

18     A.   I believe so, yes.  We don't have that

19  as an exhibit.

20          MR. HOLCOMB:  Never mind about that

21  then.  The only remaining thing we want to do,

22  Ernest, is go through the videos here and ask him

23  about that.  Brian is going to play maestro

24  because he's got all the images up on his computer

25  there.

1            MR. NOMURA:  Logistically, how are we

2   going to do that?

3            MR. HOLCOMB:  We're going to show him

4   the videos that we have on the disk here provided

5   to you.  Brian's got them all on his computer.

6   We're just going to show him a little snippet and

7   say, Is that a true and exact depiction of what

8   happened?

9            MR. NOMURA:  A couple issues.  I don't

10  know to what extent you want the court reporter to

11  transcribe what is being said.

12           MR. HOLCOMB:  I understand your

13  objections about being what's said.  I don't want

14  the court reporter to transcribe what's being

15  said.  I want to show him, for example, this gets

16  into the compounding of the exhibits.

17           But what's marked as Number 1 on this

18  video, we're going to show him these specified

19  snippets and to ask him if it's a true and correct

20  depiction.

21           MR. NOMURA:  On that, I have an issue.

22  He's not the -- I don't know how to characterize

23  it.  He's not the author of the video.  He doesn't

24  know what kind of editing, if any editing occurred

25  at all.  I have no problem with the document --

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

1  the document is -- it is what it is.  And whether

2  or not this is authentication questions or

3  whatever foundation evidentiary issues and hurdles

4  that the proponent would need to go through, we're

5  certainly not waiving any of those concerns.

6          MR. HOLCOMB:  I understand.

7          MR. NOMURA:  But something showing Mr.

8  Chun, a YouTube video or the disks from cell

9  phones, et cetera, poses some concerns because he,

10  himself was not the publisher, if you will, or the

11  author of that.

12          He can give you his observation of what

13  everyone will see on the video.  But I don't know

14  if he can tell one way or the other if this

15  happened on a specific day and explain what's

16  going on.

17          MR. HOLCOMB:  I understand that.  Well,

18  the only thing we're going to ask him is not

19  observations about what's going on, per se, at

20  this time.  I'm not even going to ask him

21  questions about that at all.

22          I'm going to say, Is this a true and

23  correct depiction of what's happening?

24          MR. NOMURA:  See the problem with that,

25  Richard, is I don't know if he is the person who

1   can -- for want of a better term, authenticate

2   what's actually being depicted on the video.

3            The video speaks for itself.  I have no

4   problem with that.

5   BY MR. HOLCOMB:

6        Q.   Let me ask this then:  Would you

7   recognize yourself on videotape, Mr. Chun?

8        A.   I could.  I think I could.

9            MR. HOLCOMB:  Then we want to show him

10   and ask him if that's him.

11            MR. NOMURA:  Fair enough.  I'm not

12   trying to be picky about it.  But there are some

13   concerns --

14            MR. HOLCOMB:  You want to preserve your

15   objections for later.

16            MR. NOMURA:  Sure.

17            MR. HOLCOMB:  This may not be the full

18   authentication the Court requires.  We understand

19   that.

20            MR. NOMURA:  Fair enough.  For that

21   purpose then, I suppose for the court reporter and

22   the record, the record can reflect that the DVD is

23   playing.  And whatever questions that you may have

24   of Mr. Chun then, Is that person you in this blue

25   aloha shirt depicted in this Video 1?  Then Mr.

1  Chun's response, Yes, it is.  That can be part of

2  the deposition record.

3             MR. HOLCOMB:  What we're going to do is

4  we're going to show him being, I'm going to say

5  what is marked Number 1 on the disk starting at

6  21 minutes to 25 minutes, is that you?  That kind

7  of thing.

8             MR. NOMURA:  Fair enough.

9             MR. HOLCOMB:  I'm not even going to ask

10 him what's going on.  Just that.

11            MR. NOMURA:  Okay.  Thank you.

12            MR. HOLCOMB:  We've got 7 of these to

13 go through.  Then we're done.

14            MR. NOMURA:  Okay.  Fair enough.

15            (Discussion off the record.)

16            (Whereupon, 7 videos were shown to the

17 deponent from Exhibit 1.)

18            MR. NOMURA:  Let me put this on the

19 record.  Let me just put in the record that the

20 videos themselves, which are part of the record

21 for purposes of a Motion for TRO and Preliminary

22 Junction, they are a compilation of videos taken

23 by miscellaneous people, including some of the

24 plaintiffs and other witnesses.

25            And it also depicts a discrete period

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

1  of time, events that have occurred before the

2  video and after the video.  It's not a complete

3  depiction of the entire SPO enforcement action on

4  any given day.  So we have some concerns about

5  the totality of the representation of SPO

6  enforcement depicted on the videos.

7            (Discussion off the record.)

8  BY MR. HOLCOMB:

9       Q.   Mr. Chun, we have shown you the disk

10  that is marked as Exhibit 1, Number 1 off of that

11  disk from 2100 to 2500.

12            Is that true?  We've shown you that?

13       A.   That's the right exhibit number.  I

14  believe so, yes.

15       Q.   And you were in that video?

16       A.   Yes.

17       Q.   And that was a true and accurate

18  depiction of what had occurred?

19            MR. NOMURA:  Let me object.  As we

20  stated earlier, the excerpt depicts a discrete

21  moment of time.  And whether or not the excerpt is

22  a function of editing or what have you.

23            Because Mr. Chun is not the author or

24  publisher of that document or that video.  So it

25  makes it difficult for me to have Mr. Chun attest

1  to the accuracy of what's depicted in the video.

2  The video speaks for itself.

3          And whether or not there is an author

4  or publisher of that video who can authenticate

5  and lay the proper foundation for this video,

6  that's another issue.  But for Mr. Chun to attest

7  as to whether or not the video accurately reflects

8  what it depicts, I think lacks foundation, it

9  assumes facts not in evidence.  And Mr. Chun can

10  respond to that question.

11     A.   It's just that it's a snippet of what

12  happened.  And there was a lot of things that

13  happened before and a lot of things that happened

14  after.  You have to look at that snippet in the

15  context of all of those events.

16  BY MR. HOLCOMB:

17     Q.   My question only pertains to that

18  snippet.

19          During that snippet that I showed you,

20  is that what happened?  Did something else happen?

21

22          MR. NOMURA:  Well, it is difficult for

23  me to understand that question because it depicts

24  what happened for multiple people who are in that

25  video.  Mr. Chun can attest to or testify as to

1  whether that video as it shows him doing what he's

2  doing.

3           But I don't know if he's the proper

4  person to ask the question, Does it accurately

5  reflect what occurred from different people in the

6  video's perspective.  It's a little bit

7  problematic.  I don't know that Mr. Chun is the

8  proper person to ask that question.

9  BY MR. HOLCOMB:

10      Q.   Mr. Chun, you would agree with me that

11  you were there when that video was made?

12      A.   Yes.

13      Q.   And you saw yourself in the video that

14  we showed you?

15      A.   Yes.

16      Q.   Are you aware -- do you recall anything

17  different happening during that time frame than

18  what is depicted in that video?

19      A.   No.  But as I said, it's a snippet of

20  events.

21      Q.   That's true.  I agree with you on that.

22   But in that snippet, you're not aware of anything

23  different happening?

24           MR. NOMURA:  As to what he --

25  BY MR. HOLCOMB:

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

109

1      Q.   As to what you personally know.

2      A.   As best as I recall, yes.

3      Q.   We're going to show him now 26:20

4  through 32 of the same tape.

5           (Discussion off the record.)

6  BY MR. HOLCOMB:

7      Q.   Mr. Chun, we've shown you now the

8  snippet between 26:20 and 32 minutes of that same

9  video.

10          Is that true?

11     A.   Yeah, but there was a splice.  It wasn't

12  a continuous video.  So there was a editing.

13     Q.   Where did the splice occur?

14     A.   Toward the beginning, I think.

15     Q.   Now, you saw yourself in that video too?

16     A.   For a little while, yes.

17     Q.   Before and after the splice?

18     A.   Yeah, I can't recall.

19     Q.   As to your participation, does that

20  video depict what happened?

21     A.   That I was present during that time,

22  yes.

23     Q.   Did anything different happen than what

24  the video shows, as far as you personally know?

25     A.   Yeah, I can't recall.

1     Q.   Other than the splice, are you aware of

2  any editing that had happened on the video?

3          MR. NOMURA:  Calls for speculation.

4  Vague and ambiguous.

5          MR. HOLCOMB:  He's sitting there

6  watching it.

7          MR. NOMURA:  I understand that.  Like I

8  said before, he's not the author or the publisher.

9  I'm using the words "author" and "publisher" in a

10  very loose fashion.  I don't know how court cases

11  describe the person taking the camera video or the

12  iPhone video.

13          But in any event, it appears in that

14  excerpt that there was a break on the video.

15  Whether or not that was a splice, an edit, we

16  don't know.  But since Mr. Chun is not the author

17  and/or publisher of that video, it makes it

18  difficult for him to respond to that question.

19  Calls for speculation.

20  BY MR. HOLCOMB:

21     Q.   Would you agree with me that you were

22  there?

23     A.   During that day of enforcement, correct.

24     Q.   On the video?  You saw yourself on that

25  video?

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

1    A.   In several instances.  On the second

2  period, not as much.

3    Q.   Not as much.  But you saw yourself on

4  the second period as well, didn't you?

5    A.   Correct.

6    Q.   And you're not aware of anything

7  different happening than what happened on the

8  video during that specific snippet of time?

9    A.   During that period of time when it was

10  deemed that it was found property, that we gave an

11  opportunity -- I remember this, that we gave an

12  opportunity for anybody there to claim their

13  personal property.

14    Q.   Really?

15    A.   Several people did take their things.

16  Jamie, the one with the ring on her lip, she took

17  her backpack -- not backpack.  It was like a

18  roller luggage thing.

19    Q.   Are you aware Mr. Smith was detained

20  across the street at that time, Mr. Christopher

21  Smith?  You know him, don't you?

22    A.   Yes, I do.

23    Q.   Are you aware that he was detained

24  across the street when this was done?

25       MR. NOMURA:  Objection.  Calls for a

1  legal conclusion.

2  BY MR. HOLCOMB:

3      Q.   I'm asking --

4           MR. NOMURA:  Vague and ambiguous.

5  BY MR. HOLCOMB:

6      Q.   Was Mr. Smith there across the street

7  when you guys left the park to go across the

8  street to take this property?

9      A.   Only thing that I know of is I don't

10  recall seeing him when we first arrived on the

11  scene.  But I did see him in the videotape walking

12  back to Thomas Square.  That's the only thing that

13  I can say.  I don't remember him specifically

14  being there that day or being detained.

15      Q.   You don't remember him specifically

16  being there when you gave this alleged opportunity

17  to get stuff back before you took it off the

18  private property of Hawaiian Braces, correct?

19      A.   Could you repeat that.

20      Q.   You don't recall -- you said that you

21  had given these guys an opportunity to get their

22  stuff back, right, before you took it off of the

23  Hawaiian Braces place?

24      A.   The City did.  We did.

25      Q.   You did?

113

1      A.   We did.

2      Q.   Who is the collective "we"?

3      A.   I can't recall.  But who actually made

4  the announcement, I don't recall.

5      Q.   Do you know whether Mr. Smith was there

6  when that announcement was made?

7      A.   I don't recall.

8      Q.   All right.  Thank you.  Now we're going

9  to show you Number 3-B off the same Exhibit 1.  So

10  I guess it would be Exhibit 1-3-B.  Specifically

11  the time period is 3:30 to 5:40.

12            MR. HOLCOMB:  Off the record.

13            (Discussion off the record.)

14  BY MR. HOLCOMB:

15      Q.   So we've shown you the 3-B-3:30 through

16  5:40 now, correct?

17      A.   I believe so.

18      Q.   You were present when that happened?

19      A.   Yes.

20      Q.   And you saw yourself in that video?

21      A.   Yes.

22      Q.   And as to your participation in the

23  video, did anything different happen that you are

24  aware of than what the video shows?

25            MR. NOMURA:  Objection.  Vague and

1   ambiguous.

2        A.   This occurred after we took down the

3   tent hanging from the tree.

4   BY MR. HOLCOMB:

5        Q.   I understand that.

6        A.   That was posing a health and safety

7   hazard to pedestrians, park users and the traffic

8   along Beretania.

9        Q.   I understand that.  But during the times

10  depicted in that video, 3:30 to 5:40, are you

11  aware of your participation in the events

12  depicted, whether anything different happened than

13  what the video shows?

14       A.   As a snippet in time, yes.

15       Q.   That depicts what happened, doesn't it,

16  during that snippet of time?

17       A.   During that snippet in time.

18       Q.   We're going to show you Number 6 off the

19  same disk.  So it would be 1-6 from times 46:00 to

20  49:00.

21            (Discussion off the record.)

22  BY MR. HOLCOMB:

23       Q.   Mr. Chun, we've shown you Exhibit 6 now,

24  46 minutes through 49 minutes, correct?

25       A.   I believe so.

1      Q.    And you saw your -- you were present

2  there?

3      A.    I believe so, yes.

4      Q.    You saw yourself in the video?

5      A.    Yes.

6      Q.    You saw yourself moving couch cushions

7  over to the garbage truck to be destroyed?

8      A.    And I was moving cushions to the rear

9  end loader, yes.

10     Q.    Were those couch cushions stolen?

11     A.    They were soiled.

12     Q.    Were they stolen?

13     A.    No, they were not.  But -- I don't know

14  if they were stolen; but they were soiled.

15     Q.    They were soiled.

16           Is that part of your five criteria?

17     A.    Yes.

18     Q.    If they are soiled.

19           So we should make a sixth criteria

20  apply?  For soiled items to be destroyed?

21     A.    It was wet.

22     Q.    It was wet, okay.

23           Those persons you saw throwing stuff

24  into the garbage truck, did they work under your

25  supervision?

1      A.   Hard to say, because there were Parks

2  and Rec people in the video as well.

3      Q.   Could have been?

4      A.   I would say highly likely, because the

5  rear loader is a Parks and Rec vehicle.  It's not

6  a DFM vehicle.

7      Q.   Now, as far as your participation goes,

8  as to your participation, did anything different

9  happen during that snippet of time than what the

10  video shows?

11      A.   What date was this enforcement?

12      Q.   September 6th.

13      A.   I don't recall.

14      Q.   You don't know if it's been edited or

15  not, do you?

16      A.   I don't know.

17      Q.   But you do remember moving those couch

18  cushions over to be destroyed?

19      A.   Well, from the video, it appeared so,

20  but I don't recall.

21      Q.   Is there a chance that perhaps you don't

22  recall having other items to be destroyed?

23          MR. NOMURA:  Objection.  Calls for

24  speculation.  Vague and ambiguous.

25      A.   I don't recall.

1 BY MR. HOLCOMB:

2     Q.   We're going to go off -- well, I'm going

3 to show you number 7 on Exhibit 1 from 1530 to

4 1630?

5          (Discussion off the record.)

6 BY MR. HOLCOMB:

7     Q.   Mr. Chun, we have shown you Number 7.

8 15:30 to 16:30, right?

9     A.   I believe so, yes.

10     Q.   And as to your participation in that --

11 well, you saw yourself in that video?

12     A.   Yes.

13     Q.   You were present?

14     A.   Yes.

15     Q.   And as to your participation, did

16 anything different happen than what's shown in

17 that video during that snippet of time?

18     A.   I don't recall.

19     Q.   The next one is Number 8, 8:40 to

20 wherever we stop.

21          (Discussion off the record.)

22 BY MR. HOLCOMB:

23     Q.   Mr. Chun, we've shown you now Exhibit 8,

24 8:40 through 19:28. Is that true?

25     A.   I believe so.

118

1      Q.   You were present?

2      A.   According to the video, yes, I was.

3      Q.   You saw yourself on the video?

4      A.   Yes, I did.

5      Q.   As to your participation, did anything

6   different happen than what the video shows?

7      A.   Yeah, maybe -- this comment applies to

8   this video clip snippet and the other ones.  I

9   would just take it at the value of the visual

10  video and not any of the sound, because of the

11  biased opinions being expressed in the audio.

12     Q.   I understand.

13     A.   In terms of the question if this is true

14  or not, it only applies to what I can visually

15  see.  It doesn't apply to anything I can hear.

16     Q.   You don't agree with any of the

17  commentary?

18     A.   I don't agree with most of it.

19     Q.   How did you determine where to put the

20  tape  the second time on here?

21     A.   The tape is generally placed -- and we

22  only did this in Thomas Square because of the

23  potential issues with the people that were there

24  and our crews.  We want to set up a safe working

25  area to have the intermingling of those two.  We

119

1  have heavy equipment.

2            It has to do the health and safety of

3  people that were there.  We have to block it off,

4  set up a working zone where there was clearly a

5  separation between our workers and the occupants

6  that were there.

7        Q.   But you recall having moved the tape at

8  this instance?

9        A.   At this instance, yeah.  Typically when

10  we set up the tape in that area, we clear up the

11  top area up to the mid block walkway.  So

12  typically, that whole top area is cleared.  We

13  don't want the people there in that top area

14  intermingling with our staff that are working.

15        Q.   So where did you determine where to put

16  it the second time?

17        A.   The second time is where we normally put

18  the tape.

19        Q.   Okay.  Do you recall throwing stuff over

20  to the taped-in area from outside the taped-in

21  area?

22        A.   I don't recall.

23            MR. HOLCOMB:  We're going to show him

24  Exhibit 9, which is pretty short.  Just show him

25  23 seconds until the end of the video.

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

120

1              (Discussion off the record.)

2   BY MR. HOLCOMB:

3       Q.    Mr. Chun, we've shown you Exhibit 9 from

4   23 seconds onward.

5              Is that true?

6       A.    I believe so, yes.

7       Q.    You saw yourself on that video?

8       A.    Not on that snippet.  I don't remember

9   seeing myself.

10      Q.    You didn't see yourself on that video at

11  all?

12      A.    No.

13      Q.    Did you recognize the guy in the park in

14  the orange vest telling the person on the bicycle

15  to leave the area?

16      A.    Was that in the snippet?

17      Q.    Uh-huh (affirmative).

18      A.    Can you repeat that?

19              (Discussion off the record.)

20  BY MR. HOLCOMB:

21      Q.    Now, we've shown you Exhibit 9 from the

22  beginning until the 23 second mark, correct?

23      A.    Yeah, I don't know.  I'm confused.

24      Q.    Well, the first time what happened was

25  we showed you after 23 seconds.  I think we were

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

1  supposed to show you before 23 seconds.

2          Anyhow, do you recognize yourself in

3  that video we just showed you?

4      A.   In that small snippet.

5      Q.   In that small snippet, which for the

6  record was the Exhibit 9 video.

7          You were present?

8      A.   According to the video, yes.

9      Q.   Do you recall being present?

10     A.   What date was this?

11     Q.   This was 11-21.

12     A.   Is that on my statement?  That date?

13     Q.   It's Paragraph 19.

14     A.   11-21, yes.

15     Q.   And you were the person that was trying

16  to take the stuff out of the person's hand, right?

17     A.   I didn't see that.

18          (Discussion off the record.)

19  BY MR. HOLCOMB:

20     Q.   Were you the person that was trying to

21  take the stuff out of the person's hands on the

22  video?

23          MR. NOMURA:  Objection.  Let me

24  interpose an objection. The video speaks for

25  itself.  I think it misstates what the video

122

1    depicts and Mr. Chun's  testimony.

2    BY MR. HOLCOMB:

3        Q.    Was that not you that had the white bag

4    or pillowcase or whatever it was with the guy on

5    the bicycle also holding it?  Was that person you?

6        A.    He wasn't holding it.

7        Q.    Was that person you?

8        A.    He wasn't holding it.

9        Q.    Was -- did you hold the white bag and

10   the white pillowcase in that video?

11       A.    I was in the video earlier, yes.

12       Q.    The video we just showed you?

13       A.    Yes.  Trish clearly states that that's

14   property that was properly noticed.  We had

15   verification.

16       Q.    I didn't ask you what Trish stated.  I

17   asked:  You were you the person that was holding

18   that white bag in Exhibit 9 up until 23 seconds?

19       A.    You have to repeat exactly the instance

20   that you want me to verify.

21       Q.    Pause it when you get there, Brian.

22       A.    That bag is on the ground.

23       Q.    I see that bag on the ground.  Pause it

24   there.

25            Is that you that just picked up that

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

123

1   white bag off the ground?

2        A.   It shows you exactly why.  We cordoned

3   off the area because of this type of interaction.

4   The stored property there.  People had come in to

5   grab the things, and interfere with our government

6   operation.  That's me.

7        Q.   That was you?

8        A.   Yes.

9        Q.   And you had also thrown over the side

10  there immediately before that, it looked like a

11  cushion and a black trash bag?

12       A.   Yes.

13       Q.   Back into the cordoned off area?

14       A.   Back to the area where it could be

15  properly sorted without interference.

16       Q.   Okay.  Now, you had stated that that

17  stuff had been properly tagged?

18       A.   No.  What I said is if you listen to the

19  video, Trish has in her hand photographs of the

20  items that we had tagged earlier.

21       Q.   Where are the tags in these exhibits

22  that we have shown you earlier for the cushion and

23  stuff?  What stuff was even in the black trash

24  bag?  Do you know?

25       A.   As I said, there's -- there's a tag, the

1  notice, the ticket where we as best as we can list

2  items.  We also take pictures of the items.  We

3  don't put a sticker or notice on every little

4  item.

5              We had, according to this video, what

6  Trish is saying, she has this pile of photographs

7  she has in her hand, verify that those items were

8  noticed earlier and was on the City property more

9  than 24 hours.

10     Q.   Did you leave those pictures in lieu of

11  a ticket or sticker on the 20th or before this

12  enforcement action?

13     A.   Could you repeat the question.

14     Q.   You said you didn't put stickers or tags

15  on those items.

16              We can agree to that, correct?

17     A.   I don't know.

18     Q.   You don't know?

19     A.   Yeah.

20     Q.   The items that you seized later and

21  don't put tickets or stickers on, you said they

22  took a picture of it, correct?

23     A.   Correct.

24     Q.   My question is:  Did you show -- did you

25  leave that picture with any other -- with the

125

1    property as you would a ticket or sticker in order

2    to give the owner notice that it had been tagged

3    pursuant to Bill 54?

4         A.   We would not.

5         Q.   You would not.  Do you know what was in

6    that trash bag depicted on that video?

7         A.   I do not.

8         Q.   Do you know what was in that white bag

9    or pillowcase that was in that video?

10        A.   I do not.

11             MR. HOLCOMB:  Can Brian and I have a

12   brief meeting of the minds here.  I think we may

13   be done.

14             MR. NOMURA:  Sure.

15             (Whereupon, a recess was taken.)

16   BY MR. HOLCOMB:

17        Q.   I have one last question for Mr. Chun,

18   then I think we're done.  Multiple people other

19   than the plaintiffs or De-Occupy made videos of

20   these incidents.

21             Is that true?

22             MR. NOMURA:  Objection.  Calls for

23   speculation.

24   BY MR. HOLCOMB:

25        Q.   Well, you saw people making videos,

126

1  correct?

2      A.   Could you repeat the question.

3      Q.   When you were out there at Thomas Square

4  on these enforcement actions, you saw City workers

5  making videos of these enforcement actions?

6      A.   I know HPD has.

7      Q.   HPD had.

8           Do you know what happened to those

9  videos?

10     A.   You would have to ask HPD.

11     Q.   But you don't know personally?

12     A.   No.

13          MR. HOLCOMB:  All right.  Thank you.  I

14  think that's it for us.

15          MR. NOMURA:  Thank you.

16          (Discussion off the record.)

17          MR. NOMURA:  After the court reporter

18  transcribes the transcript, we would like to have

19  signature by the witness.

20          (Deposition concluded at 5:00 p.m.)

21

22

23

24

25

127

1          I, WESTLEY CHUN, hereby certify that I

2    have read the foregoing typewritten pages; and

3    corrections, if any, were noted by me; and the

4    same is now an accurate and complete transcript of

5    my testimony.

6

7              Dated at_____Hawaii

8              this_____day of_____, 2014

9

10             _____

11             WESTLEY CHUN

12

13

14   Signed before me this_____day

15   of_____, 2014.

16

17   _____

18   Witness to Deponent's Signature

19

20

21   De-Occupy Honolulu, et al. vs.

22   City and County of Honolulu, et al.

23   Civil No. CV12-00668 JMS-KSC, January 6, 2014

24   by William T. Barton, RPR, CSR.

25

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

128

```
1                  C E R T I F I C A T E

2         I, WILLIAM T. BARTON, C.S.R., do hereby
   certify:
3
          That I was acting as shorthand reporter in
4  the foregoing matter on January 6, 2014,
   commencing at 1:10 p.m.;
5         That WESTLEY CHUN, the deponent whose
   testimony is contained herein, prior to being
6  examined and pursuant to HRS 606-13.8 was duly
   sworn or affirmed;
7         That the deposition herein was by me taken
   down in machine shorthand and thereafter reduced
8  to print via computer-aided transcription under my
   supervision; that the foregoing represents a
9  complete and accurate transcript of the testimony
   of said witness to the best of my ability;
10        That pursuant to HRCP Rule 30(e) if signature
   was requested by the deponent or by counsel before
11 the completion of the deposition, the deponent was
   notified through counsel, by mail, or by telephone
12 to appear and sign; that if the deposition is not
   signed, either the reading and signing were
13 waived, the deponent has failed to appear, or a
   request to review and sign was not made before the
14 conclusion of the deposition, and the original has
   been sealed unsigned;
15        That pursuant to HRCP 30(f)(1) the original
   will be forwarded to noticing counsel for
16 retention.
          I further certify that I am neither counsel
17 for any of the parties hereto, nor in any way
   interested in the outcome of the cause named in
18 the caption.
          Dated this 11th day of January 2014 at
19 Honolulu, Hawaii.

20

21        _____
                  WILLIAM T. BARTON, CSR No. 391
                  Certified Shorthand Reporter
22

23

24

25
```

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222