1

1        IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF HAWAII

3                    ---:---

4   DE-OCCUPY HONOLULU; CATHERINE ) Civil No.
    RUSSELL; CHRISTOPHER SMITH;   ) CV12-00668 JMS-KSC
5   ANDREW SMITH; MADORI          )
    RUMPUNGWORN; DOMINIC JAMES;   )
6   and JOHN DOES 1-50,           )
                                  )
7            Plaintiffs,          )
                                  )
8       vs.                       )
                                  )
9   CITY AND COUNTY OF HONOLULU;  )
    WESTLEY CHUN, in his personal )
10  and official capacity; TRISH  )
    MORIKAWA, in her personal and )
11  official capacity; LARRY      )
    SANTOS, in his personal and   )
12  official capacity; KEN        )
    SHIMIZU, in his personal and  )
13  official capacity; and John   )
    Does 1-50,                    )
14                                )
             Defendants.          )
15  _____)

16

17            DEPOSITION OF WESTLEY CHUN

18  Taken on behalf of Plaintiffs at the Department of

19  the Corporation Counsel, 530 South King Street,

20  Room 110, Honolulu, Hawaii, commencing at 1:10

21  p.m. on January 6, 2014, pursuant to Notice.

22

23

24  Before:   WILLIAM T. BARTON, RPR, CSR NO. 391

25

        CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

Exhibit 13

43

1    they would say, We need these particular tasks

2    accomplished?

3        A.   Not in those words, no.

4        Q.   Well, tell me.  I'm wondering because we

5    were talking about training, and then you said the

6    briefing.

7             Was the briefing specifically for the

8    purpose of informing everyone of what tasks needed

9    to be accomplished by the Department of Facilities

10   Maintenance?

11       A.   It was these were people that had worked

12   there, briefing me on what things that needed to

13   be done or providing advice.

14       Q.   Okay.  And -- but you had no other

15   formal training?

16       A.   Not that I can recall.

17       Q.   Now, at some point, you became aware

18   that your responsibilities would entail enforcing

19   Bill 54, which is the Stored Property Ordinance.

20            Do you recall that?

21       A.   We were one of several departments, yes.

22       Q.   And how did you learn that information?

23       A.   I don't recall.

24       Q.   And did you have any training regarding

25   enforcement of Bill 54?

EXHIBIT 13

1      A.   I can recall at least one training

2   session, yes.

3      Q.   When was that?

4      A.   I can't recall.

5      Q.   Who was the instructor?

6      A.   We had corporation counsel.

7      Q.   Who with the corporation counsel was

8   your instructor?

9      A.   I can't recall.

10     Q.   How long did that training last?

11     A.   I can't recall.

12     Q.   What did you learn at that training

13  session?

14     A.   We reviewed over the process and general

15  procedures.

16     Q.   Did you receive any materials from that

17  training?

18     A.   I think at that time, we saw the

19  notification stickers and the follow-up notice of

20  impoundment.

21     Q.   So the forms that you would leave is

22  what you saw?

23     A.   Yes.

24     Q.   Now, you said that they reviewed the

25  process and the general procedures; is that

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

EXHIBIT 13

45

1  correct?

2      A.   Yes.

3      Q.   Did those procedures and process include

4  seizing of untagged items?

5      A.   Could you repeat the question.

6      Q.   Did the process and general procedures

7  that you learned in that training class, did that

8  include the seizing of untagged or items that had

9  not been tagged with notice 24 hours before the

10 seizure?

11     A.   Could you please define what you mean by

12 "tagged."

13     Q.   Well, let's go through it.  You learned

14 in that class that you would be placing a notice

15 on property that was --

16          (Whereupon, a secretary briefly entered

17 the room.)

18 BY MR. HOLCOMB:

19     Q.   You learned in that training that you

20 would be going to different sites on the island

21 and placing a notice or affixing a notice on

22 certain property that was believed to be violating

23 the stored property ordinance?

24     A.   No.

25     Q.   Okay.  You would place these -- you

EXHIBIT 13

46

1    would place notifications on property that was on

2    a sidewalk?

3          A.    We would place it on some items.

4          Q.    Which items?

5          A.    The larger items, to give the owner

6    notification that their property was under notice.

7    There wasn't a notice or a sticker put on every

8    little item.

9          Q.    So what is a larger item?

10         A.    A bike, tent, box, chairs that were

11   outside and exposed.

12         Q.    Ultimately, you or the people out there

13   under your supervision would decide whether

14   something was a larger or smaller item.

15               Is that true?

16         A.    Could you repeat the question.

17         Q.    When you went to these sites, I mean it

18   was up to you guys, you and the people that were

19   working with you, to determine which items to tag

20   and which not to tag.

21               Is that fair?

22         A.    Could you define "tagging" again.

23         Q.    I'm sorry.  Which items you would leave

24   notice on.  And if I say "tagged," I mean leaving

25   on the item, the 24-hour notice.

EXHIBIT 13

47

1      A.   By leaving notice, there's two ways that

2   we did it.  One was with the ticket and one was

3   with the sticker.  So could you please clarify

4   what you mean by "notice."

5      Q.   What I'm going to ask you is:  What is

6   the difference between the ticket and the sticker?

7      A.   What we would best try to do is to break

8   up the property in to what we thought were owned

9   by a one individual or group of individuals.  And

10  we would give that group, grouping of property, a

11  ticket.  Any of the large stuff that we thought

12  were attached to that group was given a sticker.

13     Q.   So the smaller stuff, you tagged with a

14  ticket, and the larger stuff you tagged with a

15  sticker?

16     A.   No.

17     Q.   Then what did you do?

18     A.   For example, if there was a tent, there

19  was a bike leaning against the tent, and there

20  were a couple of other things in the front of the

21  tent, we would place the ticket on the tent.  And

22  that ticket number would be coordinated with the

23  stickers, that ticket number would be written on

24  the stickers and put it on the larger items around

25  that area to give that owner notice that their

EXHIBIT 13

48

1  items were under notice.

2      Q.   Okay.  And on that ticket, you would

3  list the different items that that ticket applied

4  to?

5      A.   As best as we could.  We also took

6  visual pictures that we used during enforcement.

7      Q.   So you have pictures of the items that

8  you were placing, whether a ticket or sticker on,

9  you had pictures before you put those tickets or

10  stickers on?

11      A.   It was generally after the items were

12  stickered they would take the pictures.  And it

13  was pretty much of everything.  Because, as I

14  said, we couldn't sticker or notice every little

15  item.

16      Q.   Is that the procedure that you learned

17  in the class from corp. counsel?

18      A.   Essentially, yes.

19      Q.   Were there any differences in the

20  procedure that you did and what you learned from

21  corp. counsel?

22      A.   No.

23      Q.   All right.  Now, once you had ticketed

24  or placed a sticker on items, you would go back

25  the next day?

EXHIBIT 13

49

1     A.   After 24 hours.

2     Q.   Which would be the next day?

3     A.   Not necessarily.

4     Q.   You would go back sometime after 24

5   hours?

6     A.   Yes.

7     Q.   How long after 24 hours?

8     A.   Two or three days at the longest.

9     Q.   So sometime within the next day or two

10   or three days after you had placed that notice on

11   there?

12     A.   Yes.

13     Q.   Now, the smaller items that were not

14   tagged with the sticker or the ticket, you would

15   nevertheless, seize those items upon your return?

16     A.   The bigger items, if they appeared in

17   the picture, yes.

18     Q.   What about the smaller items that you

19   had not placed a sticker or ticket on?

20     A.   If they were strewn about, we would take

21   those items as well.

22     Q.   What if they were inside a tent?

23     A.   The general procedure if the tent was

24   given notice, the tent and its contents was

25   removed.

ExHIBIT   13

50

1      Q.   And who taught you that procedure?

2      A.   That was in the training session.

3      Q.   Now, what about items that you deemed

4  are dangerous?  Were you authorized to take those

5  items without notice?

6      A.   If we were out there and we saw

7  something that was a health and safety issue, we

8  would take those items.  I don't recall in

9  particular what we did; but we would.

10     Q.   Are signs health and safety issues?  Are

11  those health and safety issues?

12     A.   Can be.

13     Q.   Under what circumstances?

14     A.   There could be a trip hazard.  They

15  could fall onto somebody.

16     Q.   And you seized signs before without

17  notice?

18     A.   There was a one sign that was mentioned.

19  And I can't recall if it was given a sticker or

20  notice, but it was a Tulsi Gabbard sign.

21     Q.   You have seized signs before without

22  them being tagged?

23     A.   That's the only one I can recall.

24     Q.   Did these procedures and process that

25  you learned from corp. counsel include destroying

EXHIBIT 13

56

1  then fine, go ahead and answer.

2            But you're going to have to let me know

3  if the extent that your response may divulge

4  attorney/client communication, then I will tell

5  you, Do not answer.

6            THE DEPONENT:  Okay.

7  BY MR. HOLCOMB:

8      Q.  If you need to consult with him Mr. Chun

9  before you answer a question, feel free to do so.

10

11           MR. NOMURA:  Fair enough.

12  BY MR. HOLCOMB:

13     Q.  I'm talking about this specific training

14  class you referred to.

15           You understand that?

16     A.  Yes.

17     Q.  Now, at that training class, what were

18  you instructed as far as when it's okay to destroy

19  rather than seize or store property?

20     A.  When?

21     Q.  Yes.

22     A.  Could you repeat that again.

23     Q.  Yes.  At this training class that you

24  attended regarding Bill 54 or Stored Property

25  Ordinance enforcement, what were you instructed as

EXHIBIT 13

57

1    to when you may destroy rather than store seized

2    property?

3         A.    If it met five criteria.

4         Q.    What are those five criteria?

5         A.    And the criteria was primarily

6    structured to prevent our storage facilities, the

7    material that would be impounded, as well as

8    health and safety.

9         Q.    What are those five criteria?

10        A.    The first item is flammable.

11        Q.    What is meant by "flammable"?

12        A.    Things that we had discarded, which

13   included gasoline, included paint.

14        Q.    Okay.  So you're talking about chemicals

15   that are combustible?

16        A.    Flammable.

17        Q.    What about tents?

18        A.    The second criteria is if it was wet.

19        Q.    What about tents?  Are they flammable?

20        A.    Tents are not flammable.

21        Q.    What about signs?  Are they flammable?

22        A.    No.  If I could say the other four

23   criteria?

24        Q.    Yes, sir.  I'm going to ask you those

25   too.

EXHIBIT 13

58

1          What are the other four?

2      A.  If it's wet.  If it's perishable.  So

3  sometimes the tent if it was broken, so if it was

4  wet and broken, tents would typically be discarded

5  under those criteria.  Building materials was the

6  fifth.

7      Q.  Okay.  So if a tent was wet and broken,

8  you would discard it?

9      A.  From what I recall, that would fall

10  under that criteria.

11      Q.  Not wet or broken, but wet and broken?

12      A.  It would depend.

13      Q.  So if you happen to go out on an

14  enforcement action when it rained, you could --

15  you believe you could destroy all tents?

16          MR. NOMURA:  Objection.  Calls for

17  speculation.  Assumes facts not in evidence.

18          MR. HOLCOMB:  What was the last part,

19  Ernest?

20          MR. NOMURA:  Assumes facts not in

21  evidence.

22  BY MR. HOLCOMB:

23      Q.  So your answer?  If the tent was wet --

24          MR. NOMURA:  Do you know?

25  BY MR. HOLCOMB:

EXHIBIT 13

60

1    Q.   According to the criteria that you

2  learned, if the tent was wet, you could destroy

3  it?  Is that true?

4          MR. NOMURA:  Same objection.  Vague and

5  ambiguous.  Misstates testimony.  Assumes facts

6  not in evidence.  Calls for speculation.

7  BY MR. HOLCOMB:

8    Q.   Is that what you learned, Mr. Chun?

9    A.   As I said, I only know of two tents

10  being destroyed.

11    Q.   I know.  I'm asking you what you

12  learned.  We'll get into what was destroyed.

13    A.   It would depend.

14    Q.   It would depend on what decision you

15  made, correct?

16    A.   No, no.

17    Q.   What would it depend upon?

18    A.   It would depend on the people that were

19  going through the material at that time.

20    Q.   What people that were going through the

21  material?

22    A.   The City workers.

23    Q.   So the City worker would make the

24  decision as to whether it was wet and should be

25  destroyed?

EXHIBIT 13

61

1      A.   In general.

2      Q.   And that you're in charge of the City

3  workers.

4            Is that true?

5      A.   I would be responsible for the City

6  workers in my department.

7      Q.   And they go through the materials?

8      A.   Not necessarily.

9      Q.   Sometimes?

10     A.   It depends.

11     Q.   Depends on what?

12     A.   If it's in the parks, it's the

13  responsibility of Parks and Rec.  If it's private

14  property, it's the responsibility of HPD.

15     Q.   And if it's on the sidewalks, it's the

16  responsibility of the Department of Facilities

17  Maintenance?

18     A.   Facility Maintenance, yes.

19     Q.   Your department?

20     A.   Yes.

21     Q.   Your workers would go through the

22  material that was on sidewalks?

23     A.   Not necessarily.

24     Q.   But they did sometimes?

25     A.   Yes.

EXHIBIT 13

63

1          What's a definition of building

2   materials?

3      A.   It would be big plywood sheets, four by

4   eight.  Pallets.  Bricks, tile, two by fours.

5      Q.   Now, some of these big plywood

6   materials, you had been out to Thomas Square and

7   saw that they had writing on those big plywood

8   sheets, right?

9      A.   Some may have, yes.

10     Q.   In your training session that you

11  referred to earlier, did you ever learn anything

12  about First Amendment protections?

13          MR. NOMURA:  Let me object to the

14  extent that any response from Mr. Chun on this

15  area may get into attorney/client communications.

16  I'm not saying that this training session that

17  involved other departments, including the

18  Department of Corporation Counsel, is an

19  attorney/client confidential communication.

20          However, if Mr. Chun's response does

21  infringe on that privilege, I'm going to instruct

22  him not to answer.  And if he can respond to this

23  question without divulging, in his mind,

24  attorney/client communication, then he's free to

25  respond to that question.

EXHIBIT 13

128

1                    C E R T I F I C A T E

2       I, WILLIAM T. BARTON, C.S.R., do hereby
   certify:
3
        That I was acting as shorthand reporter in
4  the foregoing matter on January 6, 2014,
   commencing at 1:10 p.m.;
5       That WESTLEY CHUN, the deponent whose
   testimony is contained herein, prior to being
6  examined and pursuant to HRS 606-13.8 was duly
   sworn or affirmed;
7       That the deposition herein was by me taken
   down in machine shorthand and thereafter reduced
8  to print via computer-aided transcription under my
   supervision; that the foregoing represents a
9  complete and accurate transcript of the testimony
   of said witness to the best of my ability;
10      That pursuant to HRCP Rule 30(e) if signature
   was requested by the deponent or by counsel before
11 the completion of the deposition, the deponent was
   notified through counsel, by mail, or by telephone
12 to appear and sign; that if the deposition is not
   signed, either the reading and signing were
13 waived, the deponent has failed to appear, or a
   request to review and sign was not made before the
14 conclusion of the deposition, and the original has
   been sealed unsigned;
15      That pursuant to HRCP 30(f)(1) the original
   will be forwarded to noticing counsel for
16 retention.
        I further certify that I am neither counsel
17 for any of the parties hereto, nor in any way
   interested in the outcome of the cause named in
18 the caption.
        Dated this 11th day of January 2014 at
19 Honolulu, Hawaii.

20
   _____
21           WILLIAM T. BARTON, CSR No. 391
             Certified Shorthand Reporter
22

23

24

25

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

EXHIBIT 13